UNITED STATES of America

v.

Michael A. S. MAKRIS.

Cr. No. 72–H–92.

United States District Court,
S. D. Texas,
Houston Division.

July 16, 1975.

Edward B. McDonough, Jr., U. S. Atty., James R. Gough, Alvin A. Horne and George A. Kelt, Jr., Asst. U. S. Attys., Houston, Tex., for plaintiff.

David Berg, Harold Lloyd, Houston, Tex., for defendant.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

This criminal action is currently before the Court as a consequence of the mandate of the Fifth Circuit Court of Appeals in its decision *United States v. Makris*, 483 F.2d 1082 (5th Cir. 1973). Pursuant to that decision, this Court is to ascertain, first, if it is possible to conduct at the present time a hearing for the purpose of determining *nunc pro tunc* the competency of the defendant to stand trial in June, 1972, and second, depending upon the resolution of the first question, to make a finding as to the defendant's competency *vel non* during the 1972 trial and, if incompetent, to retry the defendant at such time as he is found to be competent.

## BACKGROUND

This criminal action for perjury stems from the testimony of the defendant before the Securities and Exchange Commission in December, 1970, at which time defendant denied discussing with Frank Sharp a trust fund of securities allegedly belonging to refugees of Nazi Germany, denied discussing financial matters with Father Michael Kennelly of the Strake Jesuit School and denied any knowledge of a corporation known as Bed Rock Petroleum. In a trial to the Court, defendant was found guilty of three counts of perjury. On appeal, the Circuit Court upheld this Court's determination that defendant was sane at the time that the offense was committed, but set aside the verdict of guilty with respect to Count I for insufficient evidence. Additionally, the case was remanded for the purpose of determining defendant's competency at the time of trial in view of the failure of this Court to issue specific findings in that respect and to hold a hearing for that purpose as required by 18 U.S.C. § 4244.

Defendant's allegation of incompetency at the June, 1972, trial stems from the fact that he underwent surgery in April, 1970, for the removal of a pituitary adenoma that resulted as a matter of necessity in the extensive manipulation of the frontal lobes of the brain and in the destruction of the pituitary gland itself. The principal thrust of his assertion of incompetency is that under stress he experiences deterioration of his personality to the extent that his responses are random and irrational and result in psychic and physical instability.

In an effort to comply with the mandate of the Court of Appeals, this Court required the defendant to undergo mental examinations at the Medical Center for Federal Prisoners at Springfield,

Missouri, in April, 1974, for a period of thirty days. The competency hearing required by the Court of Appeals was then set for May 30, 1974. With considerable reluctance, but out of an abundance of caution, this Court continued that hearing to permit further examinations, tests and treatment of the defendant in view of his allegation that he had suffered a stroke during the latter portion of his stay at Springfield and accompanying medical testimony focusing on the potential hazards of proceeding ahead at that time. Ultimately, the competency hearing was commenced on December 3, 1974. At that time the defendant apparently suffered some type of seizure in the courtroom. This episode resulted in his hospitalization and prompted defense counsel to move once more for a continuance. Recognizing defendant's theory of incompetency under the stress of a courtroom proceeding and the resulting procedural impasse that could confound and indefinitely delay any meaningful resolution of this case, the Court ruled that the hearing would proceed, even though it meant that the defendant would be absent for most of the testimony. (Hearing Transcript 81–91.)

Accordingly, it is necessary for the Court first to determine if it was proper for the Court to proceed with the § 4244 hearing directed by the Court of Appeals in the absence of the defendant. If such evidence can be considered, it will then be necessary for the Court to consider if it can adjudge *nunc pro tunc* the defendant's competency at the time of trial in June, 1972. Depending upon the outcome of this determination, it will be necessary for the court either to evaluate the defendant's competency at the time of trial or at the present time for purposes of retrial. Additionally, the Court must consider and resolve defendant's *Motion for Judgment of Not Guilty or for Dismissal of Charges or for a New Trial* premised upon his assertion that certain key medical records had been altered or omitted from those supplied to him and his counsel.

## THE VIABILITY OF THE COMPETENCY HEARING IN THE ABSENCE OF THE DEFENDANT

Upon the collapse of the defendant in the courtroom shortly after the commencement of the competency hearing on December 4, 1974, this Court proceeded to hear the expert and lay testimony from numerous witnesses over the strenuous objections of defense counsel. After review of appropriate legal authorities and an in-depth consideration of the facts leading to that decision to continue, the Court does not find that its view of the law now varies from that set forth in the Memorandum and Opinion issued on December 4, 1974. Admittedly, there is some authority elsewhere for the proposition that a competency hearing may not proceed in the absence of the defendant. *See United States v. Horowitz*, 360 F.Supp. 772 (E.D.Pa. 1973); *United States v. Abrams*, 35 F.R.D. 529 (S.D.N.Y.1964), *aff'd* 357 F.2d 539 (2d Cir.), *cert. denied*, 384 U.S. 1001, 86 S.Ct. 1922, 16 L.Ed.2d 1014 (1966); *Martin v. Settle*, 192 F.Supp. 156 (W.D.Mo.1961). *Contra, Johnson v. United States*, 293 F.2d 100 (5th Cir. 1961). However, upon closer examination of the question, this Court does not believe that the absence of the defendant from the hearing in December, 1974, precludes this Court from using that proceeding to satisfy the requisites of 18 U.S.C. § 4244.

The right of a defendant to be present during a criminal proceeding rests upon a threefold basis: (1) the provisions of Rule 43 of the Federal Rules of Criminal Procedure; (2) the confrontation clause of the Sixth Amendment; and (3) the due process clause of the Fifth Amendment. For the reasons set forth below, the Court does not find that the defendant's presence at the December hearing is mandated by these provisions.

Rule 43 of the Federal Rules of Criminal Procedure provides that

[t]he defendant shall be present at the arraignment, at every stage of the trial including the impaneling of the

jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by these rules.

Of critical importance to the determination of the Court is the question of whether a competency hearing can be considered a "stage of the trial".

■ The notes of the advisory committee with respect to this rule provide that the principle requiring the defendant's presence "does not apply to hearings on motions made prior to or after trial". As support for this proposition, the committee cited *United States v. Lynch,* 132 F.2d 111 (3d Cir. 1943), which held that the defendant's right to be present at his trial did not "embrace a right to be present also at the argument of motions prior to trial or subsequent to verdict". *Id.* at 113. *Accord, Williams v. United States,* 358 F.2d 325 (9th Cir. 1966); *Dunnivan v. Peyton,* 292 F.Supp. 173 (W.D.Va.1968); *Pope v. United States,* 287 F.Supp. 214, 219 (W.D.Tex.1967), *aff'd,* 398 F.2d 834 (5th Cir. 1968), *cert. denied,* 393 U.S. 1097, 89 S.Ct. 886, 21 L.Ed.2d 787 (1969). Although it may be argued that the rationale of *Lynch* is inapplicable to a hearing in which evidence in addition to argument is presented, the Fifth Circuit Court of Appeals has held that an evidentiary suppression hearing is not a " 'critical stage' of the proceedings within Rule 43 . . . ." *United States v. Gradsky,* 434 F.2d 880 (5th Cir. 1970), *cert. denied,* 401 U.S. 925, 91 S.Ct. 884, 27 L.Ed.2d 828 (1971). *See also Yates v. United States,* 418 F.2d 1228 (6th Cir. 1969). Accordingly, the Court does not find that Rule 43 requires the presence of the defendant at a *nunc pro tunc* hearing pursuant to 18 U.S.C. § 4244.

■ Nor does the Court find that the presence of the defendant is required by the confrontation clause of the Sixth Amendment in order to enable defense counsel adequately to cross examine witnesses. *See Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). As a matter of law, the Fifth Circuit in *Gradsky* refused to extend the right of presence of the defendant under the Sixth Amendment to an evidentiary hearing. Furthermore, it has been recognized in other aspects of the criminal process that the presence of the defendant to aid in cross-examining is not required in proceedings not involving questions of guilt or innocence. *See United States v. Hayman,* 342 U.S. 205, 222, 72 S.Ct. 263, 96 L.Ed. 232 (1952) (Sixth Amendment does not mandate presence of defendant at § 2255 proceeding); *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed.2d 1337 (1949) (defendant not entitled to cross-examine witnesses supplying sentencing information).

Of signal importance, however, is that factually the circumstances at the commencement of the hearing indicate that defendant could have been of little assistance to his counsel in cross-examining witnesses. The major portion of the evidence at the competency hearing was composed of expert medical witnesses who testified with respect to matters that were not peculiarly within the knowledge of the defendant himself. Although defendant might have been able to assist his counsel in cross-examining certain of the lay witnesses, defense counsel, at the commencement of the proceeding, specifically stated on the record that defendant was of no assistance to him in conducting the hearing and requested that the defendant be allowed to remain seated at the rear of the courtroom in the company of his family. The request was granted. The Court is cognizant that defense counsel later precipitously changed his position in that regard, thereby raising some question in the eyes of this Court as to genuineness of counsel's initial request. Separate and apart from the trial tactics employed, this Court does not find that the absence of the defendant at this hearing prejudiced him in any manner. Had he remained throughout this proceeding in the rear of the courtroom as

requested, his assistance to counsel would have been minimal at best.[1]

Lastly, the Court does not find that proceeding in the absence of the defendant made the § 4244 hearing so inherently unfair as to violate the requisites of the due process clause of the Fifth Amendment. In this regard, the Supreme Court has distinguished the privilege of presence from the privilege of confrontation. *Snyder v. Massachusetts,* 291 U.S. 97, 107, 54 S.Ct. 330, 78 L.Ed. 674 (1934). "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.* at 107–08, 54 S.Ct. at 333. In the present case, there is little the defendant could do or gain by his presence in the rear of the courtroom. Counsel for defendant strenuously argues that if defendant were present counsel could demonstrate defendant's incompetency by giving him a series of instructions that defendant would fail to execute in the presence of the Court. Even if the Court were to assume that defendant would have performed in the manner described by counsel, the Court finds that such a demonstration could be so easily contrived as to be of little persuasiveness in the light of all other evidence adduced on the issue of competency. Accordingly, the Court does not find that the absence of the defendant from the courtroom during the proceeding violated due process as protected by the Fifth Amendment.

It should be noted that at the competency hearing the Government raised the question of whether or not the defendant, in view of the study he had made of his impairment and its symptoms, was feigning symptoms of seizure or self-inducing these attacks through regulation of his hormone replacement therapy. If such conduct had been proved, it may well have formed the basis for a determination by this Court that the defendant had waived any right that he possessed of being present at the hearing. Although there was some suggestion along these lines in the evidence, the Court does not find it of sufficient magnitude to permit any determination that the defendant purposefully waived his right to be present. Therefore, the Court's decision to proceed is in no way predicated upon a finding of waiver.

## ABILITY TO CONDUCT A MEANINGFUL HEARING "NUNC PRO TUNC"

The Supreme Court has expressly recognized the problems of conducting a meaningful hearing to determine competency after the lapse of any appreciable period of time since conviction. *See Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). Nonetheless, under the circumstances of the present case the Court finds that the hearing of December, 1974, is meaningful with respect to determining the defendant's competency at the time of trial in June, 1972.

Unlike the situation in *Pate,* the fact finder in this case, the Court, had the opportunity to observe first-hand the demeanor of the witnesses and defendant during the trial of this matter. Furthermore, expert witnesses who examined the defendant during the period of trial are still available today to offer evidence with respect to the defendant's ability at that time to comprehend the nature of the proceedings against him and to assist his counsel in his defense. Thus, these experts do not need to rely upon the printed record of the trial or upon recent examinations of the defend-

---

1. The Court recognizes that the defendant may have been able to assist his counsel by supplying information relative to a business transaction between the defendant and one of his physicians, Dr. D. M. LaPere, about which defense counsel had no knowledge; however, the Court does not find this testimony significant in impeaching the doctor's credibility and has disregarded it in assessing the merits of the question now before it.

ant in order to assess what his mental ability would have been in 1972. Due to the relative proximity in time to the SEC hearing of certain business dealings involving defendant, there appeared at the hearing, in addition to the experts, numerous lay witnesses who had dealt with the defendant under various circumstances within the time frame of the trial. Accordingly, it is the opinion of this Court that the evidence adduced at the competency hearing in December, 1974, when coupled with evidence previously presented at trial, is more than sufficient to permit a meaningful adjudication of the competency of the defendant at the June, 1972, trial.

## THE COMPETENCY OF THE DEFENDANT AT THE TIME OF TRIAL

In conducting the competency hearing and the trial of this matter, the Court has been continuously impressed with the voluminous evidence as to the exceptional mentality of the defendant. The consensus of those testifying in this hearing and at the trial is that the defendant was a person of unusual mental abilities prior to the removal of the pituitary adenoma. Additionally, he was considered by the majority of witnesses to be extremely affable, courteous and a very gifted businessman. Information contained within the pre-sentence investigation report contributes to this profile. The defendant was a licensed pilot and alleged to be a member of Mensa. The father of four children, he is reputed to be a devoted family man. He is trilingual, the result of being the son of Greek nationals, of having been partially educated in Mexico and of residing, going to school and working for a period of time in the United States. The defendant has earned a living by dealing in securities or operating various business establishments. He has previously been convicted by the United States District Court in Miami, Florida, of securities violations, which ultimately resulted in his being incarcerated for a two-year period. Although this is the only conviction of any significance on defendant's record, he has apparently been involved in a series of questionable securities transactions in Florida, Texas and Mexico that have resulted in the loss of his Florida securities broker's permit, a civil injunction against violations of the 1933 Securities Act issued by the District Court for the Southern District of Texas and his deportation from Mexico.

■ The allegations of defendant's incompetency at the June, 1972, trial stem from the fact that he suffers from an organic brain syndrome, the result of the removal of a pituitary adenoma in April, 1970. Because of the position of the pituitary vis a vis the brain, excision of this tumor required entering the cranial cavity through the upper part of the forehead and manipulating the frontal lobes in order to reach the center of the brain. This type of operation, according to medical experts, has resulted typically in three types of disability:

(1) a certain amount of damage to the brain resulting whenever an operation of this nature is performed;

(2) the loss to the body of the pituitary gland and its regulatory function, which requires hormone replacement therapy;

(3) psychological problems resulting from the realization of inability to perform in the same manner as prior to the operation.

The paramount question for this Court to determine is the extent of this defendant's resulting disability.

## LAY TESTIMONY

From a consideration of the testimony of lay witnesses presented at the original trial in June, 1972, and the competency hearing held by this Court in December, 1974, a sequential picture of the defendant's demeanor, activities and business dealings prior to and at or about the time of trial may be formulated.

The trial testimony of Chester Jones, Dr. Jerald Senter and Maurice Powers

indicates that prior to the surgery of April, 1970, the defendant was the hub of schemes to purchase Bed Rock Petroleum Company and Youngblood's Fine Foods, Inc., and that he was actively engaged in arranging for financing and providing for the transfer of corporate control, including electing new officers and obtaining possession of corporate records. Yet, throughout these transactions, defendant's name never appears as an officer of either corporation or on any note involved in financing the purchase. Both Mr. Jones and Dr. Senter testified that they saw no change in the defendant's appearance and business acumen after surgery. (Trial Transcript at 398–99; 402; 438–39; 455–57.)

Testimony of Frank Sharp, Father Michael Kennelly and Truett Peachy indicate that the defendant was actively engaged in the summer and early fall of 1970 in a scheme to purchase Braniff Airlines and to finance this deal by obtaining a large sum of European securities that could be purchased at a fraction of their face value. Father Michael Alchediak testified to meeting with the defendant in October, 1970, and giving the defendant, at the request of Frank Sharp, 20,000 shares of Sharpstown Bank stock belonging to the Jesuit Fathers in exchange for the defendant's note in the amount of $1,000,000. Father Alchediak testified that the purpose of this transaction was to assist the defendant in freeing a large, but undisclosed, amount of securities located in Europe that was a part of the defendant's inheritance. Prior to this exchange, Alchediak testified that he had been sent to Europe in order to sign a letter of credit to facilitate the defendant's acquisition of the European stocks. Morton Susman, a Houston attorney and counsel to Frank Sharp, testified regarding a meeting with the defendant on December 15, 1970, in which the latter explained in detail the transaction by which he intended to acquire the stocks located in Europe. Susman testified that the defendant was able to discuss the transaction in depth and that

nothing appeared unusual about his mental processes. (Trial Transcript at 604–605.)

A review of the transcript of the SEC hearing which took place on the following morning, December 16, 1970, reveals that the defendant was able to answer questions in a clear and rational manner, even though he denied knowledge of the European securities and other matters. Steve Watson, who interrogated the defendant at that interview, testified that the defendant was not remarkably nervous and that his demeanor and speech were not unusual. (Trial Transcript at 81.) Joseph Dooling, an FBI agent, who met with Frank Sharp and the defendant on the evening of December 16, 1970, testified that nothing appeared unusual with respect to defendant's mentality and that the defendant refused to discuss the stock transaction with him upon being warned that the information volunteered might be used against him. (Trial Transcript at 716.) Likewise, in early January of 1971 the defendant was capable of going into great detail and convincing Jimmy Day, who had appeared at Frank Sharp's request, of the viability of this scheme to obtain European securities. (Trial Transcript at 531–532.) Shortly thereafter Day and Makris met in New York City where the defendant was subjected to in-depth questioning lasting one to two hours concerning the transaction by a securities lawyer with the firm of Mudge, Rose, Guthrie and Alexander. (Trial Transcript 533–537.) Day testified that during this conference the defendant was attentive and answered questions very clearly. (Trial Transcript at 540.)

Apart from the defendant's activities regarding the large fund of securities located in Europe, it appears that he engaged in other business and personal affairs in a competent and responsible manner. Leon Brown testified that between January, 1971, and May, 1972, he did business on numerous occasions with defendant's Tidy Didy Diaper Service in Houston by dealing over the telephone

with a male whose voice he knew as that of the defendant. He testified that he was complimented, allegedly by the defendant, who identified himself as "Mike", on a scheme by which he succeeded in having defendant's bank make good on a check drawn on the company's account that had previously been returned for insufficient funds. (Trial Transcript 706–710.) Of unusual significance, however, is the testimony of Ted Hirtz, who negotiated the settlement of a lawsuit with the defendant and his counsel over a period of time between October, 1972, and August, 1973. Hirtz described the defendant as possessing the uncanny ability to work complex mathematical problems in his head. (Hearing Transcript at 34.) Attorney Hirtz further testified that defendant was a gifted man, a "consummate negotiator" with good memory recall who could be precise when he wanted to be and equally vague when it served his strategy to do so. (Hearing Transcript at 49.)

Dr. Robert Bunch, a podiatrist, attested to the defendant's rational responses during a brief medical examination for a minor foot problem just prior to trial which commenced on June 6, 1972. Likewise, Jesse Clark, a United States Probation Officer, who interviewed the defendant in depth just after his conviction on June 15, 1972, and thereafter on several occasions, confirmed the fact that the defendant related in detail his past history, indicating that any memory impairment was slight, if it existed at all. Clark also described a medical notebook compiled by the defendant with regard to tumors and brain damage as related to his physical condition and several medical books that the defendant had obtained so as to educate himself on his physical condition. (Hearing Transcript at 107.) The defendant was viewed by Clark as a very intelligent person whose competency was never in question. (Hearing Transcript at 116.)

Testimony of defendant's wife and daughter, as well as a close business associate and friend, Ted Clegg, supports the defendant's contentions that he is incompetent because, upon being subjected to certain stressful situations, he experiences a deterioration in his personality that will manifest itself by episodes of trembling, vomiting, perspiration, etc. The members of the defendant's family testified that defendant is never permitted to travel anywhere by himself for fear that he may become ill. Testimony of defendant's counsel indicated that the defendant is not as aggressive as he was at one time in his life and that he has a tendency to avoid stressful situations. Several witnesses attested to the fact that defendant, on a number of occasions, had abruptly left a business meeting or other stressful situations, and that such departures had resulted in his vomiting and returning to his home in order to rest and regain his composure. Furthermore, witnesses testified that the defendant's facility in use of the English language has somewhat diminished as reflected by the fact that during the course of a conversation he will hesitate and grope for words.

Two of defendant's trial counsel testified as to his competency. In spite of the fact that they admitted the defendant was capable of identifying witnesses and informing counsel of the existence of documents, counsel did testify that the defendant was of no use to them in preparing for trial and that his responses to their inquiries were often illogical. However, when pressed further to describe these illogical responses, it appears that alternate legal approaches to the defense of this case had been entertained by other defense counsel who handled the litigation at an earlier stage and that these may have had some bearing on defendant's responses and the resulting misunderstandings on the part of counsel. (Trial Transcript at 650–52.)

## EXPERT MEDICAL TESTIMONY

There appears to be a general consensus among the medical experts with respect to the cause and nature of defend-

ant's organic brain syndrome. Although it is generally agreed that the defendant's cognitive and memory functions are impaired to some extent as a consequence of the pituitary adenoma and its surgical removal, most agreed that the defendant is capable of functioning in a relatively normal fashion in non-stress situations. Thus, although defendant's intelligence quota is believed to have diminished as a result of the surgery, testimony of several witnesses indicated that he still continues to function at an intelligence level which is above normal. However, when placed in a stressful situation, it was generally recognized that the defendant's responses to his environment might become unpredictable, arbitrary or random. There was some expert testimony to the effect that certain stress could cause the total physical collapse of the defendant, and some experts attributed the incident in the courtroom at the commencement of the competency hearing to the defendant's inability to cope with the stress of his courtroom appearance. Medically, this inability to handle stress is attributable to the excision of the pituitary gland and the accompanying loss of that gland's regulatory function in determining the amount of cortisone needed by the body to deal with a given stressful situation. For the most part, the medical experts agreed that the defendant is not psychotic and that any loss of contact with reality that he may experience under such stressful circumstances is temporary. In other words, shortly after each courtroom experience he would again be able to resume routine non-stressful activities.

Furthermore, there is some expert testimony to the effect that the defendant himself recognizes his condition and can compensate for it in some manner. In this respect, Dr. Russell Settle testified that it was a regular occurrence in his interviews with the defendant for the defendant abruptly to begin perspiring and holding his head and to leave for a short period of time. (Hearing Tran-script at 504.) Dr. Settle also reported that the defendant admitted that he is able to handle stressful business situations by withdrawing, taking some medicine, resting briefly and drinking a cup of coffee with plenty of sugar. (Hearing Transcript at 579.)

It appears, however, that the medical experts disagree with respect to the extent of defendant's impairment during the course of the trial in June, 1972. Drs. Settle, Goldstein and Nagaswami, who are all associated with the Menninger Clinic in Topeka, Kansas, and who examined the defendant over two years after the trial, indicated that the defendant could not have comprehended the nature of the proceedings against him or assisted his counsel. Dr. A. H. Vogt, who examined the defendant just prior to the 1972 trial, testified then and at the competency hearing, that the defendant could understand the proceedings against him, but he was not sure if he could deal with his counsel for purposes of participating in his own defense in view of trial counsel's forthright temperament. On the other hand, doctors from the Medical Center for Federal Prisoners at Springfield, Missouri, appearing on behalf of the Government, testified that the defendant was competent to stand trial, if necessary, as of December, 1974. In view of this divergence of viewpoint, this Court finds of significance the testimony of Dr. K. D. Charalampous, who, although attesting to his belief of the defendant's competency, testified that the ability to sustain stress varies among individuals. This was confirmed by Drs. Vogt and Nagaswami who asserted that stress varies with individuals depending upon the nature of the situation at hand and the regimen that one has been accustomed to following. Likewise, other experts testified that there is no way to accurately predict the extent of impairment that may result from manipulation of the frontal lobes of the brain in connection with excision of the pituitary gland.

## ANALYSIS OF THE EVIDENCE AS TO DEFENDANT'S COMPETENCY

In assessing the defendant's individual ability to cope with the stress encountered in this criminal proceeding, the Court finds that the medical opinions are conflicting and inconclusive. In this regard, the Court finds particularly that it can give little weight to the opinions of the experts from the Menninger Clinic who examined the defendant more than two years after trial, and who were the strongest witnesses in favor of a finding of incompetency. First, it is apparent that the opinions of the Menninger staff were rendered with the experts knowing little or nothing of the defendant's history, except what the defendant and his wife told them. Although certain of these experts admitted that the tests upon which they based their diagnoses could be faked, they were generally unaware that they were dealing with an exceptional individual who was highly motivated to project his psychic and physical condition in as serious a light as possible and who had acquired considerable knowledge beforehand on his own about his admittedly highly sophisticated medical impairment. Second, it does not appear that the experts from Kansas were examining the defendant with the idea of determining his competency in a legal sense. In this regard, these experts generally believed that the defendant had come to them to learn how to cope more effectively with his present condition; they were not primarily concerned with his capacity to comprehend and assist counsel at the time of trial.

Apart from the Menninger experts, the Court is still unpersuaded by the testimony of other medical experts favoring a finding of incompetency, since it is undisputed and indeed comports with common sense that the degree of impairment stemming from a given medical malady varies among individuals. Furthermore, the Court is unpersuaded by the attestations of medical experts that lay testimony must be discounted because the defendant's impairment can be discerned only by the expert eye after close examination. Any impairment which is that obscure and esoteric can scarcely be of sufficient magnitude to render the defendant unable to understand basically what is going on in a court of law and unable to confer intelligently with his counsel in his own defense. Rather, what emerges from the lengthy record of this case and this Court's weighing of the credibility of the testimony is that this defendant is no ordinary individual who can be categorized routinely by clinical testing. There is simply no better way for a court to assess the competency of a brain-injured individual in a particular set of circumstances than to scrutinize evidence as to that individual's actual performances at various intervals within the critical time frame. Fortunately these voluminous instances, some stressful and some otherwise, shed considerable light and in their totality eliminate any reasonable doubt as to the competency of the defendant prior to and at the time of his trial in June, 1972. Accordingly, the Court finds that it is dealing with an extraordinary individual possessed of remarkable industry, ingenuity and guile and that it must rest its determination as to his competency upon the composite testimony of lay witnesses who observed the defendant pursue his sophisticated business transactions and activities under a variety of circumstances in which he would be unwilling to fake or be incapable of disguising his true mental state.

Although the defendant's wife and daughter testified that certain stressful situations caused him to tremble, perspire and become nauseated, the total picture presented by other lay witnesses indicates that the defendant is quite capable of functioning well in a number of situations that would be highly stressful to a majority of other persons. In this respect, the lay testimony offered at the trial and at the competency hearing presents the picture of a highly skilled negotiator who following the April, 1970, operation had been deeply involved in a

number of questionable transactions and able to convince various highly intelligent and skilled businessmen and attorneys of the viability of his schemes while he remained aloof and behind the scenes, avoiding personal liability and personal recognition. Indeed, this is a characteristic pattern that had permeated the defendant's business dealings before the operation.

Apart from his testimony at the SEC proceeding in December, 1970, wherein the Court found the defendant to be competent, this Court has noted as examples certain other instances within the critical time period that qualify as stressful incidents which the defendant handled adroitly: (1) the negotiations and settlement of a lawsuit brought against defendant's own business by Attorney Ted Hirtz who related his extensive dealings with defendant between October, 1972, and August, 1973, including his observations of defendant's capacity during such period to perform in his head complex mathematical problems with accuracy; (2) defendant's success in persuading Frank Sharp and his advisors and thereafter Sharp's New York attorney after a one to two hour detailed interrogation in January, 1971, of the feasibility of procuring a large quantity of securities located in Europe and allegedly belonging, alternatively, to the defendant or to Nazi refugees.

Furthermore, this Court is unpersuaded by the argument that the defendant, when involved in highly complex business transactions, is not subjected to stress because he is accustomed to that type of environment, but that when required to make a courtroom appearance he will promptly experience disorientation and physical collapse. The practical convenience of such a malady cannot be overestimated—although incompetent to answer for his actions in a court of law, the defendant has been and continues to be capable of functioning in a complex business environment. The Court does not find plausible such an argument and rejects it.

In assessing the defendant's competency at the time of trial, this Court places significant weight upon its own observations of the defendant during the entire course of that proceeding. The defendant apparently was overcome by stress on several occasions during the trial when he left the courtroom for short periods. After a brief absence, the defendant returned, indicating to the Court that he was utilizing the techniques that he had acquired to compensate for this disability. Otherwise, during the course of the trial, the Court on occasion observed the defendant conferring with his counsel and responding to the Court rationally in appropriate instances. (See Trial Transcript 61–69; 1131–32; 1138; 1141.) The defendant displayed during the trial as well as at sentencing none of the physical manifestations indicative of his inability to cope with a stressful situation.

The Court has been wholly aware throughout this litigation of the nature of the defendant's illness and the surgical procedures involved. However, a serious illness in and of itself cannot compel a conclusion of legal incompetency, particularly when a detailed chronology of defendant's activities since the April, 1970, operation directly refutes any such medical assessment. The Court therefore finds that the defendant was quite capable of understanding the nature of the proceedings against him and of assisting his counsel at his trial in June, 1972. Having so found, the Court finds it unnecessary to consider and resolve the issue as to whether the defendant is competent to stand trial at this time.[2]

---

2. The medical evidence conflicts on this point as well. Of some interest as to defendant's current capacity for employment is Dr. Settle's refusal to accept defendant's assertion when giving a history that he is able to function in a high level job but with difficulty (Hearing Transcript at 579E). The Government in its brief vigorously disputes defendant's claimed difficulties in his work and contends that it stands ready to offer convincing proof on defendant's current capacity and high earnings if the issue is reached.

## DEFENDANT'S MOTION FOR JUDGMENT OF NOT GUILTY OR FOR DISMISSAL OF CHARGES OR FOR A NEW TRIAL

██ By this motion, defendant requests that the Court grant him a new trial because the experts who testified at defendant's trial in June, 1972, were not provided with certain medical records of M. D. Anderson Hospital. These include records of examinations of the defendant at the Endocrine Clinic on January 19, 1972, and May 24, 1972. Additionally, defendant asserts that neither he nor his counsel was provided with the medical records containing a handwritten entry dated December 3, 1971, of an examination in which the defendant reported a period of disorientation, believed by the attending physician to be a temporal lobe seizure induced by a low cortisol level.

With respect to the records of the examinations of January 19, 1972, and May 24, 1972, counsel argues that these records would have permitted defense counsel to discover that low cortisol levels were revealed by tests conducted on May 24, 1972, and, subsequently, May 31, 1972. According to defense counsel, these are germane in demonstrating that the defendant was incompetent because of a hormone deficiency at the time of trial, which commenced on June 6, 1972. The Court does not find that a motion for a new trial with respect to this evidence is appropriate in view of the fact that counsel was supplied with these records prior to the competency hearing. Accordingly, this evidence, which relates to the issue of competency, was before the Court and expert witnesses at the time that the competency issue was decided. A new trial on this issue, therefore, is unnecessary.

██ With respect to the entry dated December 3, 1971, counsel for defendant argues that this is significant in demonstrating that the defendant could be disoriented by virtue of a temporal lobe seizure and thus could have been legally insane at the time of the SEC hearing held in December, 1970. In order to prevail on a motion for a new trial, a defendant must demonstrate the existence of four prerequisites:

(1) the evidence is newly discovered and was unknown to the defendant at the time of trial;

(2) the evidence is material and not merely cumulative or impeaching;

(3) the evidence would probably produce an acquittal; and

(4) failure to learn of the evidence was not due to lack of diligence on the part of the defendant.

*See, e. g., United States v. Rachal,* 473 F.2d 1338 (5th Cir. 1973).

██ Assuming, for purposes of this motion, that counsel for defendant were able to satisfy the requisites numbered 1, 2 and 4, this Court does not find that the evidence of a temporal lobe seizure, experienced a year after the SEC hearing, is sufficient to demonstrate to this Court that the defendant was not responsible for his actions at the time of the hearing. In this respect, there is no evidence that the defendant's cortisol level at the time of the hearing was sufficient to induce such a seizure. Furthermore, the record of the hearing itself, as well as the observations of those involved in questioning the defendant, adequately demonstrate that he was not disoriented or out of touch with reality at that time. Therefore, the information revealed by the December 3, 1971, entry would not produce a different verdict in this case, which was tried to the Court.

## CONCLUSION

Premised upon the testimony adduced at the trial and at the competency hearing, as well as the observations of this Court with respect to the defendant's behavior and physical condition during such proceedings as well as at sentencing, the Court concludes that the defendant was competent to stand trial in 1972.

The Court does not reach, therefore, the issue of whether or not the defendant is competent to stand trial today. Defendant's Motion for Judgment of Not Guilty or for Dismissal of Charges or for a New Trial is denied.