UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael A. S. MAKRIS,
Defendant-Appellant.

No. 75–3090.

United States Court of Appeals,
Fifth Circuit.

July 23, 1976.

Rehearing and Rehearing En Banc
Denied Sept. 22, 1976.

---

Michael Anthony Maness, Houston, Tex., for defendant-appellant.

Edward B. McDonough, Jr., U. S. Atty., James R. Gough, George A. Kelt, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before DYER and CLARK, Circuit Judges, and KRAFT,* District Judge.

CLARK, Circuit Judge:

This is the second appeal emanating from the 1972 federal perjury conviction of Michael A. S. Makris for falsely testifying before the Securities and Exchange Commission. Pursuant to the mandate of this court issued in defendant's first appeal, the district court conducted a *nunc pro tunc* competency hearing to determine whether Makris was competent to stand trial in 1972. After deciding the threshold question that a meaningful hearing was possible, the court received extensive medical and lay testimony and concluded that Makris was legally competent under the standard enunciated in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). We affirm.

The factual background and procedural history of this litigation is detailed in our prior opinion. *United States v. Makris*, 483 F.2d 1082 (5th Cir. 1973). In brief, Makris' legal problems stem from his December 1970 appearance before the SEC when he denied involvement in two allegedly fraudulent securities schemes then under investigation. In June 1972, Makris was tried and convicted under a three-count perjury indictment and given a consecutive sentence. To expedite the criminal appeals process, this court chose to resolve Makris' challenges to the sufficiency of the evidence in his direct appeal, reversing his conviction under Count I but rejecting that attack on the remaining counts.

What could not be finally decided in our prior disposition was the crucial question of defendant's competency to stand trial. In April 1970, approximately two years before trial, Makris underwent radical brain surgery for the removal of a large pituitary tumor. The operation required manipulation of the frontal lobes and destruction of the pituitary gland itself. All experts agree that the surgery left defendant impaired both physically and mentally. The extent of that impairment and the legal effects that flow therefrom are the central issues in this case.

From the outset of this litigation, the proper assessment of defendant's mental state has been of major concern. Prior to the bench trial, the judge appointed a psychiatrist to examine Makris and report on his condition to the court. In addition, the court held an extensive pretrial hearing, pursuant to a defense suppression motion, which in effect determined Makris' sanity at the time of the offense. Although affirming the district court's finding of sanity on appeal, we were constrained to hold the procedures employed deficient, in that no hearing directed to the issue of competency to stand trial had been conducted, a violation of the strictures of 18 U.S.C. § 4244. We remanded for the two-step determination of whether a meaningful *nunc pro tunc* hearing was possible and, if so, whether Makris was fit to stand trial in 1972.

Following remand, the district court directed defendant to undergo further psychiatric evaluation at the Medical Center for Federal Prisoners at Springfield, Missouri. The tests were conducted in April 1974 and the competency hearing set for May 30, 1974. A continuance was granted when defendant alleged that he suffered a stroke during his stay at Springfield. When the hearing finally commenced on December 3, 1974, Makris apparently suffered a seizure in the courtroom. Although defendant was hospitalized and thus unable to be present for most of the hearing, the court elected to proceed. The district court held that proceeding in the defendant's absence did not violate Makris' statutory or constitutional rights. Defendant does not complain of this ruling on appeal.

---

* Senior District Judge of the Eastern District of Pennsylvania, sitting by designation.

The district court's lengthy opinion (reported at 398 F.Supp. 507) adequately summarizes the extensive testimony received at the competency hearing as well as evidence gleaned from the transcript of the 1972 perjury trial and the 1970 SEC hearing. Having served as the trial judge in this case, the court could also take advantage of its recollections of defendant's demeanor during the critical time-frame. The voluminous record built up pertinent to defendant's mental status contains lay and medical observations contemporaneous with the trial as well as current expert evaluation based on recent medical examinations.

The picture of Makris' mental condition presented by these diverse sources is conflicting. There is no dispute, however, that prior to surgery, defendant was considered an extremely brilliant man, able to speak three languages (Greek, English, Spanish) and make a lucrative income from operating various businesses and dealing in securities. How much Makris changed as a result of the operation is the highly contested matter. At the risk of oversimplifying, it is fair to state that the bulk of lay testimony pointed to competency, while the expert medical evidence suggested incompetency.

The many physicians who examined Makris characterized the effects of the brain surgery as an organic brain syndrome. In particular, Makris experienced difficulty with speech perception, his recent memory was impaired and his overall intellectual capacity diminished. The removal of the pituitary gland also necessitated that Makris undergo hormone replacement therapy because of his body's inability to produce and secrete cortisone. The experts explained that prescribing the correct dosage to suit an individual patient's physical and psychological needs was not a simple task. If the amount of medication were insufficient, the user might become disoriented or irrational. Finally, it was repeatedly acknowledged that the brain-damaged person might develop psychological side effects from the depressing realization that he was no longer able to function at his previous level. The doctors also emphasized that

each of these three disabilities could be exacerbated by stress. In their opinion, although Makris might be able to function normally in his normal environment, when confronted with a stressful situation (such as a criminal prosecution) his responses might become unpredictable and random.

The crucial question as to what extent these admitted deficiencies operated to impair defendant's ability to understand the proceedings in 1972 and to assist his defense attorneys did not produce a single answer from the experts who testified at the competency hearing. What emerges as significant, however, is that no medical expert would categorically state that Makris was legally competent in 1972. Three witnesses from the Menninger Clinic (a psychiatrist, a psychologist and a neurologist) who conducted a weeklong evaluation of defendant in the fall of 1974 concluded that Makris was incompetent at the time of trial. In contrast, doctors from the Springfield facility refused to express any opinion on defendant's condition in 1972, but agreed that at the time of their examination in 1974 Makris was competent. A Houston psychiatrist appearing as a government witness also declined to diagnose defendant's state as of 1972 because he lacked sufficient collateral information upon which to formulate an opinion. The two experts who had the benefit of examining defendant close to the trial date agreed that Makris was incapable of assisting in his own defense. Dr. Riley, a neurologist, based his opinion on Makris' general condition:

The man has an organic brain syndrome. Such a person, no matter how optimal you might make all other aspects of his medical situation, cannot be relied upon to perform in a predictable and consistently meaningful way under stress.

Dr. Vogt, the psychiatrist appointed by the court to examine Makris prior to trial, concluded that defendant was unable to communicate effectively with trial counsel, partly because of his attorney's forthright temperament:

I just don't think that he [the attorney] would sit still for waiting for Mike Mak-

ris to get himself organized, and if he pushed him, he damn sure wouldn't get him organized to give relevant and pertinent information.

In addition to live expert testimony, the court had before it medical reports from several other physicians verifying the existence and seriousness of defendant's impairment and documentary evidence indicating that Makris' cortisol level was very low just a week before trial.

Some of the evidence received from nonexperts tended to corroborate the view of Makris as a brain-damaged person likely to become incapacitated in stressful situations. Members of defendant's family testified that they never let defendant travel alone for fear he might become ill. Friends and business associates recounted how defendant left meetings abruptly, suffering from vomiting, trembling and perspiration. On occasion Makris would lose his facility with the English language and grope for words. Most significantly, two of Makris' defense attorneys testified at trial that defendant was absolutely no help in preparing for trial and that his responses to their questions were slow and illogical.

In marked contrast, several business associates and other lay witnesses who had contact with Makris during the critical timeframe related that defendant behaved in a highly competent fashion and showed no signs of debilitating mental illness. Only a few months subsequent to surgery, Makris was actively engaged in coordinating a complex financial transaction directed at acquiring a large fund of foreign securities. Witnesses appearing before the SEC in 1970 and at the perjury trial gave rather consistent accounts of Makris as a shrewd businessman who conducted his affairs remarkably well even after his surgery. Ted Hirtz, an attorney who had negotiated the settlement of a lawsuit with defendant and his counsel over a period of time ranging from October 1972 to August 1973, testified at the competency hearing that he was impressed by defendant's uncanny ability to handle mathematical computations in his head. In Hirtz's view, Makris was a fine negotiator who only departed from his usual precise manner and became "vague" when it served his purposes to do so. Jesse Clark, the probation officer who prepared Makris' presentence report and conducted five personal interviews (including a home visit) in connection therewith, described how defendant was able to recall past events in detail and always appeared alert and intelligent at their meetings. Clark's testimony also revealed that Makris was extremely knowledgeable about brain disorders as a consequence of studying several medical texts and preparing an essay-type paper dealing with his own symptoms and problems.

As for defendant's demeanor at trial, the trial judge observed that Makris appeared normal, that he conferred with his counsel throughout the proceeding and that he responded rationally to the court's inquiries. On several occasions, however, defendant was apparently overcome by stress and forced to leave the courtroom to regain his composure. Since Makris did not take the stand, there is no hard evidence available concerning his ability to withstand vigorous questioning.

The district court's analysis of the evidence placed primary emphasis on the "composite testimony of lay witnesses" and for the most part refused to credit the medical experts' conclusions, characterizing their opinions as "conflicting and inconclusive." 398 F.Supp. at 516. What impressed the court at the outset was Makris' unusual mental abilities prior to surgery. Conceding that some impairment was a necessary concomitant to the removal of the tumor, the court relied heavily on lay descriptions of defendant's behavior to conclude that the deterioration was not so severe as to render Makris incompetent. The conclusions of the Menninger staff were accorded little weight in the court's balancing, primarily because Makris and his wife were the sources for the background information provided these experts and had never informed the doctors that they would be called upon to make a legal assessment of defendant's competency. The other medi-

cal opinions favoring incompetency were also unable to convince the court that defendant's malady would serve to incapacitate him at trial, but would not substantially affect his business performance. While not making an express finding, the court did not rule out the possibility that Makris had at least at times faked the effects of his illness. To the district court defendant appeared as "an exceptional individual who was highly motivated to project his psychic and physical condition in as serious a light as possible." 398 F.Supp. at 516. Most importantly, the court was convinced that by the time of trial, Makris had learned to cope with his disabilities so as to minimize even the short-term negative effects of his illness. In sum, the district court concluded that the profile of Makris projected by his business associates was the true one and that the deleterious effects of his operation were substantially under control at the time of trial.

## I. Meaningfulness of *Nunc Pro Tunc* Competency Hearing

In our prior opinion, we instructed the district court to make the initial determination of whether a meaningful hearing on Makris' competency could be made two and one-half years after trial. While leaving the ultimate determination to the trial court, we expressed our view that despite the inherent difficulty associated with retrospective undertakings, "in the present case the possibility of an adequate hearing at this time is greatly enhanced by the fact that the trial court will have the benefit of testimony from the court-appointed physician who examined the defendant shortly before trial as well as its own personal observation of the appellant during trial." 483 F.2d at 1092. On remand, the district court agreed that a meaningful hearing could be conducted, citing in addition to the above two factors, the availability of testimony from lay witnesses who had contact with the defendant and observed his behavior during the relevant period.

Both the Supreme Court and this circuit are acutely aware of the hazards connected with retrospective competency hearings. *See Drope v. Missouri,* 420 U.S. 162, 182, 95 S.Ct. 896, 909, 43 L.Ed.2d 103 (1975); *Pate v. Robinson,* 383 U.S. 375, 387, 86 S.Ct. 836, 843, 15 L.Ed.2d 815 (1966); *Lee v. Alabama,* 386 F.2d 97 (5th Cir. 1967) (en banc), *on remand,* 291 F.Supp. 921 (M.D.Ala.1967), *aff'd,* 406 F.2d 466 (5th Cir.), *cert. denied,* 395 U.S. 927, 89 S.Ct. 1787, 23 L.Ed.2d 246 (1969). A concurrent determination is indisputably the preferred method for insuring an accurate assessment of defendant's mental status. Nevertheless, this court has repeatedly sanctioned *nunc pro tunc* proceedings where there is sufficient data available to guarantee reliability. *Lee v. Alabama,* 386 F.2d 97 (5th Cir. 1967) (en banc).

Understandably, hard and fast rules in this area have not been formulated. Like the determination of competency itself, the question of meaningfulness can be answered only by a full review of the facts of each case, taking into account the quality and quantity of available data as well as the opinion of experts.

 Although clearly relevant, the time factor is not determinative. *Compare Carroll v. Beto,* 330 F.Supp. 71 (N.D.Tex. 1971), *aff'd,* 446 F.2d 648 (5th Cir. 1971) (meaningful hearing possible 23 years after trial), *with Clark v. Beto,* 283 F.Supp. 272 (S.D.Tex.1968), *aff'd,* 415 F.2d 71 (5th Cir. 1968) (no hearing possible after a lapse of 8 years). The passage of even a considerable amount of time may not be an insurmountable obstacle if there is sufficient evidence in the record derived from knowledge contemporaneous to trial. *Conner v. Wingo,* 429 F.2d 630 (6th Cir. 1970), *cert. denied,* 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 121 (1972). Especially when defendant's mental state was at issue, the transcript of the trial itself may provide a solid starting point for reliable reconstruction of the pertinent facts. *Lee v. Alabama,* 386 F.2d 97, 112 (5th Cir. 1967) (en banc) (Thornberry, J., concurring). Mental examinations conducted close to the trial date, of course, increase the probability that the *nunc pro tunc* hearing will not be unduly speculative. *Hollo-*

*way v. United States,* 119 U.S.App.D.C. 396, 343 F.2d 265 (1964). Likewise, the recollections of non-experts (including the observations of the trial judge) who had the opportunity to interact with defendant during the relevant period may in some instances provide a sufficient base upon which a factfinder may rest his decision that even a belated determination will be accurate.

Makris does not dispute that the parties have built up a considerable record pertinent to the competency issue and certainly the district court did not suffer from any lack of available data. Rather, defendant's complaint centers around the court's treatment of the experts' conclusions as they relate to meaningfulness. The physicians who testified for the government uniformly refused to offer an opinion as to Makris' competency in 1972. Only those experts who believed defendant incompetent were willing to project backwards in time. Most significantly, the two doctors who examined Makris contemporaneously with the trial concluded that defendant was incompetent at that time.

In this appeal Makris argues that it was improper for the court to doubly disregard the experts by on the one hand concluding that a retrospective determination was possible and then rejecting the conclusions of those experts who agreed with that assessment. Further, defendant points out the inconsistency of asserting that meaningfulness is enhanced by the availability of contemporaneous medical evidence, yet rejecting the conclusions of those witnesses in deciding the ultimate question of competency.

▆▆ The deficiency of defendant's argument is that it focuses exclusively on the medical evidence. In contrast, the meaningfulness inquiry is essentially a legal one which the court must make for itself. While the experts can provide guidance, the judge is not bound to agree with their conclusions if other probative evidence points to a different result. *Cf. Mims v. United States,* 375 F.2d 135 (5th Cir. 1967). Only by reviewing the entire record, including the evidence provided by medical experts

and lay persons as well, could the district court determine whether time had seriously eroded the chances of an adequate hearing. The reluctance of some physicians to express retrospective opinions is not controlling. Such hesitancy may result from an abundance of professional caution or may simply be due to a lack of familiarity or opportunity to examine the entire record. Similarly, the court is not bound to accept the experts' conclusions on the ultimate issue of competency, simply because the existence of contemporaneous factual evidence of a medical nature contributed to the court's ruling on meaningfulness. In this case, the contemporaneous lay and medical evidence can not be said to be wholly reconcilable. The existence of both types of evidence tended to increase the likelihood that a *nunc pro tunc* proceeding would be meaningful. Given the clear conflict in views, the court necessarily had to weigh one type more heavily than the other in order to reach any determination at all. Of course, the court could have concluded that the conflict itself so diminished the prospects of arriving at an accurate assessment that a retrospective hearing would therefore be meaningless. *See Clark v. Beto,* 359 F.2d 554 (5th Cir. 1966). Equally permissible, however, was the course chosen by the trial judge, *i. e.,* to resolve the conflict by giving more credence to the lay evidence. The court's ruling on meaningfulness is amply supported by the voluminous record and we refuse to disturb it on appeal.

## II. Burden of Proof/Scope of Review

The advent of two recent Supreme Court decisions necessitate that before reaching the merits of this case, we re-examine preliminary questions relating to the government's burden of proof and the scope of appellate review. Although threshold inquiries, the proper standards for the district and appellate courts to apply in federal competency hearings have received little attention and the Supreme Court has yet to speak directly to these points. Makris urges us to interpret *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508

(1975), to require the government to prove competency beyond a reasonable doubt before a district court may order the defendant to stand trial. In conjunction with the burden of proof standard, defendant also reads *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), as directing appellate courts to discard the clearly erroneous rule when reviewing a lower court's competency determination. We disagree with the major portion of defendant's analysis and adopt a less stringent approach in both aspects.

■ There can be no question that in federal criminal cases the government has the burden of proving defendant competent to stand trial at the § 4244 hearing or its *nunc pro tunc* substitute. *Conner v. Wingo,* 429 F.2d 630, 639 (6th Cir. 1970). Whether this burden can only be discharged by proof beyond a reasonable doubt is the question to resolve in light of *Mullaney.* In that case, the Supreme Court held that a Maine statute requiring a homicide defendant to prove sudden provocation was violative of due process. In placing the burden on the state to prove the absence of mitigating factors beyond a reasonable doubt, the Court emphasized the requirement that every fact necessary to constitute the crime charged must be proven by that most stringent standard. The *Mullaney* decision did not purport to cover all potential issues raised during the course of a criminal trial if they were not directly related to the elements of the crime. To highlight that limitation, two concurring Justices expressed the view that *Mullaney* would not displace the rule that there is no constitutional requirement for the state to prove the defendant's sanity. *See Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). Moreover, the Court has affirmatively approved lesser standards for the determination of issues which do not affect the reliability of a jury verdict. In *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), the preponderance standard was sanctioned for judging the admissibility of confessions. The emphasis in *Lego* was on giving substance to the presumption of innocence. The Court made

clear that even though a determination affected substantial constitutional rights, the beyond-a-reasonable-doubt standard would not be mandated unless an element of the crime was involved. *Id.* at 487, 92 S.Ct. at 625.

Were it not for the necessary interrelation between the burden of proof issue and our standard of review, we would not have to decide the burden question today. The district court expressly found that all reasonable doubt as to defendant's competency had been eliminated by the persuasive lay testimony concerning Makris' performance and behavior. Without characterizing the standard as mandatory, the district court clearly applied the most severe test and nevertheless ruled against defendant. However, to adequately review that determination by any appellate standard, we must first decide the minimum that the government was required to prove. If competency need only be proven by a preponderance of the evidence, the lower court's competency finding will more easily pass muster on appeal.

■ We are persuaded by the reasoning in *Lego* that in the exercise of our supervisory power, we should adopt the preponderance standard for federal competency hearings. The Supreme Court rulings not only do not compel application of a stricter standard, they consistently point to "element of the crime" as the proper demarcation line. Further, the Court has pointed out that "[i]t is no more persuasive to impose the stricter standard of proof as an exercise of supervisory power than as a constitutional rule." *Id.* at 488 n. 16, 92 S.Ct. at 626 n. 16.

Our decision in no way undermines the due process prohibition against proceeding against incompetent defendants. The accused will continue to have the statutory and constitutional protection of an independent judicial determination of mental competency. Requiring more would unduly burden the prosecution.

There is more validity to Makris' argument on the scope of appellate review, although we also decline to adopt it in full.

This court has frequently treated mental competency as a fact question governed by a clearly erroneous or equally narrow appellate standard. *See Lee v. Alabama,* 406 F.2d 466 (5th Cir. 1969) (clearly erroneous); *United States v. Gray,* 421 F.2d 316 (5th Cir. 1970) (clearly arbitrary or unwarranted). Apparently, the rationale has been the traditional one that the district court is in the best position to judge credibility and mediate complex factual disputes.

 The question of competency, of course, is a mixed question of law and fact which has direct constitutional repercussions. It thus would be improper for a federal court to give conclusive weight to a state court finding of competency without re-analyzing the facts. Reaffirming the requirement of independent federal factfinding, the Supreme Court in *Drope v. Missouri, supra,* emphasized that competency should not be cast in an operative fact mold and thus insulated from constitutional adjudication. In a footnote, the court warned against the tendency to confuse evidentiary facts with inferences and conclusions:

> But 'issue of fact' is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct, or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication. . . Especially in cases arising under the Due Process Clause it is important to distinguish between issues of fact that are here foreclosed and issues which, though cast in the form of determinations of fact, are the very issues to review which this Court sits. . . .

*Id.* at 175 n. 10, 95 S.Ct. at 905 n. 10.

 *Drope* was a state court review. Thus, the Court had no specific occasion to comment upon the use of the clearly erroneous rule in federal cases. In a federal prosecution, there is of course no comparable intercourt problem with independent federal factfinding. The only controversy centers around the deference which should be accorded the district court's initial determination. Although *Drope* does not prohibit operation of the clearly erroneous rule in the federal context, the footnote language indicates to us that we should take a hard look at the trial judge's ultimate conclusion and not allow the talisman of clearly erroneous to substitute for thoroughgoing appellate review of quasi-legal issues. This process of subjecting inferences or ultimate facts to a broader review is not novel. *See Skou v. United States,* 526 F.2d 293, 295 (5th Cir. 1976); *Galena Oaks Corp. v. Scofield,* 218 F.2d 217 (5th Cir. 1954). It is especially appropriate when constitutional rights are at stake. *Cf. Fortin v. Darlington Little League,* 514 F.2d 344, 349 (1st Cir. 1975). We stress, however, that we by no means adopt the requirement of a de novo review. We say no more than that the clearly erroneous rule is to be limited to its proper sphere. It is not to be discarded.

III. Competency

 The test of mental competency under 18 U.S.C. § 4244 is whether a defendant has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him. *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). To adequately apply this legal standard, a court must thoroughly acquaint itself with the defendant's mental condition. The medical description or classification of defendant's illness, however, does not end the inquiry. The court is faced with the difficult task of analyzing the medical and other evidence to arrive at a legal conclusion. When that determination is retrospective, the weighing process must necessarily place greater emphasis on evidence derived from knowledge contemporaneous with the trial.

Before concluding that Makris was competent under the *Dusky* standard, the district court analyzed the evidentiary facts to arrive at a few crucial primary inferences.

Since each of these inferences is amply supported by the record, our task on appeal is limited to a critical reappraisal of the court's ultimate competency determination.

In substance, the district court found that although the defendant suffered from three disabilities as a result of his surgery, he had learned to compensate for his illness. In addition to his ability to cope with stressful situations, defendant was found by the court to be a man capable of faking or exaggerating his symptoms to suit his own purposes. These faking and coping conclusions are supported by both the lay and medical evidence. For example, Makris' probation officer described how defendant had acquired considerable medical knowledge of his own condition which could have aided in projecting a false picture to the Menninger group. There was also expert testimony that defendant had admitted that he had learned to cope with stressful business situations by taking medicine, resting and drinking coffee.

Once the court made these primary factual inferences, it had only to add a few salient factors to arrive at its competency conclusion. Most important was the court's finding that the degree of impairment varies among individuals and that Makris had been a man of exceptional mentality prior to surgery. While another person might have been incapacitated by such a severe operation, the court concluded that Makris was able to function well enough to pass the *Dusky* test.

█ In challenging this ultimate finding, Makris primarily focuses on the court's disregard of the experts' conclusions and attacks the validity of the lay testimony. We reject the defendant's contention that the court's weighing process was deficient and hold that the court was correct in finding that the lay evidence amply rebutted the conclusions of some of the experts.

█ It is well settled that expert opinion is not binding on the trier of fact if there is reason to discount it. *Mims v. United States*, 375 F.2d 135 (5th Cir. 1967). Especially where the medical expert applies legal standards to arrive at ·a competency

conclusion, he is performing a task at which only a judge is truly an expert. In the final analysis, the determination of competency is a legal conclusion; even if the experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his attorney and able to rationally and factually comprehend the proceedings against him.

In this case, the district court advanced two sound reasons for according little weight to the medical evidence favoring incompetency. First, the probative force of the opinions of the Menninger group were lessened by the fact that defendant and his wife provided the doctors with defendant's medical history and neglected to inform them of the patient's legal difficulties. Second and most important, the observed conduct of defendant by his friends and business associates did not correspond to the assessment of Makris as a severely brain-damaged individual incapacitated by stress. *See United States v. Makris*, 483 F.2d 1082, 1090 (5th Cir. 1973). Moreover, the lay testimony could only be described as overwhelming. It covered the entire period from just prior to surgery until well after the trial date and presented a sequential picture of Makris as a shrewd businessman who, though handicapped, was not debilitated by his physical illness. Makris' citation of *United States v. Gray,* 421 F.2d 316 (5th Cir. 1970), for the proposition that the lay testimony was insufficient to rebut contrary medical evidence is inapposite. In *Gray,* we held that

> While a lay witness's observation of abnormal acts by an accused may be of great value as evidence, *a statement that the witness never observed an abnormal act on the part of the accused is of value if, but only if, the witness had prolonged and intimate contact with the accused.*

*Id.* at 318.

█ In contrast to *Gray*, the abundant lay testimony in this case consisted of more than mere declarations that the defendant appeared normal to his friends and associ-

ates. Rather, the vivid descriptions of defendant's business acuity and his ability to conduct complex financial transactions throughout the critical period leads to the compelling conclusion that Makris continued to be a highly competent man. It must be recognized that it does not violate due process to proceed against a man who suffers from physical or mental ailments as long as he still has the capacity to consult with his attorney and understand the proceedings.

The district court's ultimate conclusion is sound. Even if Makris experienced temporary problems during the trial, it is most probable that he was never so impaired that he functioned below the level contemplated by the *Dusky* standard. Our agreement with the district court is bolstered by the fact that there is much contemporaneous lay evidence supporting the competency determination.

Since all other challenges raised by defendant were resolved in our prior appeal, his conviction is

AFFIRMED.