IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 92-7076

———————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GEORGE JAMES DOCKINS,

Defendant-Appellant.

———————————————

Appeal from the United States District Court
for the Northern District of Mississippi

———————————————

(March 12, 1993)

Before Reynaldo G. GARZA, HIGGINBOTHAM, and Emilio M. GARZA, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Defendant appeals his convictions on two grounds. He first argues that the district court erred in ruling him competent to stand trial and in failing to grant a mistrial and hold a third competency hearing after his behavior at trial. Second, defendant urges that the government failed to prove his status as a convicted felon, requiring reversal of his convictions for possession of a firearm by a convicted felon and making false statements in the acquisition of a firearm. We affirm.

I.

In June 1987, defendant George James Dockins, using the name of Carl Smith, had repairs performed on his car at Little Willie's

Salvage and Garage in Clarksdale, Mississippi. When Dockins went to pick up his car on June 30, he told the garage owner that someone had removed a shotgun from the car's trunk. After a brief search, Dockins found the gun and left the garage.

On July 22, Dockins returned to Little Willie's to pick up his car which had undergone further repairs. He informed the garage's foreman that he would not pay for the repairs without first taking the car for a test drive. Dockins then drove, with the foreman as his passenger, to the home of one of Dockins' relatives in Marks, Mississippi. After a brief stop, Dockins began to head in the opposite direction instead of returning to the garage. Dockins' passenger complained and, when the car came to a stop at an intersection, pushed it into park, took the keys from the ignition, and jumped out of the car. Dockins had other keys, however, and drove away.

The passenger gave the police a description of the car. The highway patrol later stopped Dockins for speeding. Dockins produced a Colorado driver's license in the name of George J. Dockins. The license check uncovered the fact that the license had been suspended, but under the name Carl Smith. After Dockins' arrest, an inventory search of the car turned up a .25 caliber, semi-automatic pistol and the sawed-off shotgun earlier seen by the garage owner. The police also found a VISA charge slip showing the purchase of a different shotgun by a Carl Smith at a local Wal-Mart.

2

ATF Agent Don Medley, Secret Service Agent Hal Purvis, and Sergeant Thomas McCloud interviewed Dockins the next day. After Miranda warnings, Dockins admitted that he purchased the pistol in Jonestown, Mississippi, used the VISA card in the name of Carl Smith, and signed the name Carl Smith on the Firearms Transaction Record, Form 4473, to buy a shotgun at Wal-Mart. The Form 4473 asked whether he had ever been convicted of a crime punishable by imprisonment exceeding one year, and Dockins, as Carl Smith, answered "no." Dockins denied knowledge of the sawed-off shotgun. Dockins admitted that he had been convicted of a felony in Colorado and that he frequently used aliases. Dockins was held in jail for approximately 60 days and released in September 1987.

A federal grand jury indicted Dockins on July 21, 1988 on two counts of illegal possession of a firearm by a convicted felon, one count of possessing an unregistered sawed-off shotgun, and one count of making false statements in the acquisition of a firearm. A plea agreement was filed on December 28, 1989, but the court rejected it when Dockins' claimed innocence at the plea proceeding.

Upon motions filed by Dockins and the government, the district court ordered psychiatric examination at the United States Medical Center for Federal Prisoners in Springfield, Missouri. After two months of treatment and examination by experts, Dockins moved for a determination of competency. On September 27, 1990, the district court conducted an evidentiary hearing and found him incompetent to stand trial. Dockins was then returned to Springfield for further evaluation and treatment which reported on February 11, 1991 that

3

Dockins was now competent to stand trial. The district court held a second evidentiary hearing on April 29, this time concluding that Dockins was competent.

Dockins went to trial in July 1991, but the trial did not proceed smoothly and the court eventually removed Dockins from the courtroom. Pointing to Dockins' conduct at trial, the defense moved for a mistrial asserting that Dockins was not competent and requested a continuance for further psychological and physical testing. The district court denied a mistrial and continuance. At the close of the government's case, the district court granted Dockins' motion for acquittal on one of the two counts alleging the illegal possession of a firearm by a convicted felon, the shotgun purchased at Wal-Mart. The jury returned a guilty verdict on the remaining three charges. Dockins filed a Motion for Judgment of Acquittal Notwithstanding the Verdict, or in the Alternative for a New Trial, arguing, among other things, that the government failed to prove by admissible evidence Dockins' status as a prior convicted felon, and he should be acquitted of possession of a firearm by a convicted felon and making false statements in the acquisition of a firearm. After a hearing, the court denied the motion and sentenced Dockins to concurrent terms of fifteen years for the illegal possession of a firearm (pistol) by a convicted felon, ten years for the illegal possession of an unregistered sawed-off shotgun, and five years for making false statements in connection with a firearm purchase. This appeal followed.

4

II.

A.

To decide competency to stand trial, a district court must determine whether "the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). While "'a district court's determination of competency to stand trial may not be set aside on review unless it is clearly arbitrary or unwarranted,'" United States v. Birdsell, 775 F.2d 645, 648 (5th Cir. 1985) (quoting United States v. Hayes, 589 F.2d 811, 822 (5th Cir. 1979)), the parties agree that this court "should take a hard look at the trial judge's ultimate conclusion and not allow the talisman of clearly erroneous to substitute for thoroughgoing appellate review of quasi-legal issues." United States v. Makris, 535 F.2d 899, 907 (5th Cir. 1976); see also Birdsell, 775 F.2d at 648. We turn to the evidence presented at Dockins' competency hearings to determine whether the district court's finding of competence was clearly arbitrary or unwarranted.

The district court held two competency hearings in which it heard the testimony of four witnesses. At the first hearing, two experts testified. Dr. James Leach, a psychiatrist, testified on behalf of the government, and Dr. William Kallman, a clinical psychologist, testified for the defense. At the second hearing, the government called Dr. Clayton Pettipiece, a staff psychiatrist

5

at Springfield, and a lay witness, Agent Donald H. Medley. Dr. Kallman testified again for the defense. All three experts stated that while Dockins suffered from schizophrenia and his mental functioning was retarded, these conditions, if treated with the proper medication, would not render him incompetent to stand trial. All three experts also agreed that Dockins had a general understanding of the nature and consequences of the proceedings. The experts, however, sharply disagreed on Dockins' ability to assist in his defense, the second part of the competency test set out in the statute.

Dr. Leach opined that Dockins was competent to stand trial. He concluded that Dockins was capable of assisting in his defense at trial if properly medicated and if his attorney spent extra time explaining the process to him. He reached this opinion after interviewing Dockins on nine occasions, totaling three to five hours in all, and considering reports from others on staff at the medical center. Dr. Leach noticed that Dockins acted differently when he knew he was being observed, leading Dr. Leach to believe that Dockins was exaggerating his symptoms and wanted it to appear that he was more disturbed than he really was. With knowledge that he was being watched, Dockins was low key, talked softly, and showed no interaction with others. In contrast, when unaware that he was being monitored, Dockins was sociable and outgoing with other prisoners and talked normally. Dockins also explained to Dr. Leach why he denied having a felony conviction on the Form 4473 he filled out at Wal-Mart. Dockins said he could not read, so he

6

answered "no" to all of the questions on the form. On cross-examination, Dr. Leach agreed that dementia was a possible alternative diagnosis.

Dr. Kallman disagreed with Dr. Leach and testified that Dockins was not competent to stand trial. He diagnosed Dockins as suffering from dementia with severe impairment in both short and long term memory which would prevent him from assisting in his own defense. He began his study of Dockins with the assumption that Dockins was faking his memory loss. Ultimately, however, Dr. Kallman concluded that Dockins' inconsistent answers to questions was a result of confabulation, making up answers when one does not remember, rather than an attempt to fake memory loss. Dr. Kallman based his opinions on two one-on-one interviews with Dockins, lasting a combined total of eight to nine hours, and extensive psychological testing. One of these tests, the Minnesota Multiphasic Personality Inventory, has two safeguards to detect faking. One safeguard is a series of questions known as the F or "Fake" scale. Dockins' MMPI showed extreme elevation of the F scale. Although a high F Scale generally indicates faking, Dr. Kallman testified that an F scale as high as Dockins suggests an organic brain dysfunction. Dockins' performance on the other tests was consistent with a diagnosis of organic brain dysfunction. Finally, Dr. Kallman testified that Dockins' I.Q. of 49 placed him in the severely retarded range.

Dr. Kallman performed another evaluation of Dockins before the second competency hearing. These interviews lasted a total of six

7

and one-half hours and included repeating some of the tests given earlier. Dr. Kallman concluded that Dockins' condition had deteriorated since the first evaluation.

Dr. Pettipiece studied Dockins between the first and second competency hearings and, like Dr. Leach, concluded that Dockins was competent to stand trial. Over a seven-week period, Dr. Pettipiece interviewed Dockins on five occasions, lasting from one-half to one and one-half hours each. Dr. Pettipiece reported that Dockins was able to find the complicated location of his office at Springfield, whereas other patients had difficulty doing so. Dr. Pettipiece also conferred with others, including a psychiatrist and psychologist, who were involved in Dockins' evaluation and treatment. Dockins told Dr. Pettipiece that he was experiencing visual and audible hallucinations, but was able to give only vague descriptions of them. Dr. Pettipiece testified that a true schizophrenic gives concrete answers about hallucinations. Dockins identified himself to Dr. Pettipiece by several different names. Nevertheless, his personality was always the same, allowing Dr. Pettipiece to rule out a multi-personality disorder. Dr. Pettipiece further concluded that Dockins was in control of his own memory loss; he suffered from a loss of integrity not a loss of memory. On cross-examination, Dr. Pettipiece testified that he could not evaluate Dockins' memory, because Dockins was "unreliable." Dr. Pettipiece based this conclusion on Dockins' use of aliases and the fact that he often asked for additional medication but chemical tests showed that he was not actually

8

taking it.  Instead, Dockins would "cheek" the medication; he would hold it in his cheek until the nurse was gone and then remove it. He also disagreed with Dr. Kallman's categorization of Dockins' I.Q. score of 49 as indicating severe retardation.  According to Dr. Pettipiece, an I.Q. result of 40-50 indicates moderate retardation while a result of 50-70 indicates mild retardation. Dr. Pettipiece's estimation of Dockins' I.Q. was somewhere around 80.  Dr. Pettipiece diagnosed Dockins as having an anti-social personality disorder, which is common to many habitual criminals but not a disorder affecting competence.

Agent Medley testified at the second competency hearing about his interview with Dockins on July 23, 1987, the day after his arrest, regarding his purchase of the shotgun at Wal-Mart on June 11, 1987.  Dockins admitted purchasing a gun and explained his use of a credit card with the name Carl Smith as necessary because his credit under his real name had been ruined by a girlfriend. Dockins told Medley about convictions in Michigan, Colorado, Missouri and Tennessee and said the Michigan conviction was on appeal.  Medley later verified that an appeal was pending on the Michigan conviction.  When asked how Medley was supposed to know if he was really George Dockins, Dockins told him he could find a birth certificate in Dockins' car to prove this fact.  Medley found the birth certificate.  He further stated Dockins acted in an appropriate manner and answered questions rationally and coherently.

After the second competency hearing, the district court concluded that the government had shown by a preponderance of the evidence that Dockins was competent to stand trial. <u>See</u>, <u>e.g.</u>, <u>United States v. Hutson</u>, 821 F.2d 1015, 1018 (5th Cir. 1987) (government bears burden of proving competence by preponderance of the evidence). In its order, the court gave a number of reasons for its finding. It mentioned the concurrence of two psychiatrists that Dockins was in control of his memory loss. The court also felt that the testimony of Agent Medley and Dockins' explanation to Dr. Leach of why he answered "no" to all questions on the Form 4473 showed that Dockins was capable of formulating a defense to the charges against him. Finally, the court was of the opinion that Dockins was simply attempting to manipulate the court, a skill he apparently learned as a result of spending much of his life in the criminal justice system.

Dockins contends that the district court's finding was arbitrary and unwarranted. Dockins first calls attention to the fact that the court held Dockins incompetent after the first hearing, thus it must have relied heavily on the testimony of Dr. Pettipiece and Agent Medley, who provided the only new evidence of competence at the second hearing. According to Dockins, these witnesses were not worthy of such reliance. Dr. Pettipiece's belief that Dockins was simply "unreliable" precluded him from taking seriously any possibility that Dockins might be suffering from dementia. As to Agent Medley, Dockins concedes that lay testimony may be beneficial on the question of competency, <u>see</u>

10

Birdsell, 775 F.2d at 650-51; White v. Estelle, 669 F.2d 973, 978 (5th Cir. 1982), but argues that his testimony was entitled to little weight because he observed Dockins over a brief span and four years before the hearing. Second, Dockins argues that Dr. Kallman's testimony was more reliable because he spent more time with Dockins, although the government experts conducted more face-to-face interviews, he was the only expert to perform objective testing, and his examinations occurred in closer proximity to the competency hearings than the other experts. See Birdsell, 775 F.2d at 650-51 (length of time spent with the defendant is reasonable basis upon which to rely on one expert over another).

The district court credited the testimony of the government's experts, both of whom testified that Dockins was competent to stand trial, and the lay testimony of Agent Medley. The governments' experts, two medical doctors with a combined experience of 63 years in medical practice, conducted a total of fourteen interviews with Dockins over a six month period and both concluded that he was competent. Although the defense expert was the only one to perform objective tests, we are unable to say that crediting the testimony of two psychiatrists who conducted subjective evaluations over the testimony of one psychologist who relied on objective tests was clearly arbitrary or unwarranted. See Birdsell, 775 F.2d at 651.

B.

Dockins also claims that his conduct during his trial should have led the district court to grant his motion for a mistrial and a third competency hearing. At the jury selection conference,

11

Dockins became angry with counsel after the government struck two black women from the venire and insisted on striking the next two veniremen against the advice of counsel. During the testimony of the government's first witness, Dockins interrupted the questioning. Following the government's second witness, Dockins attempted to fire his counsel. After counsel discussed his difficulties in preparing cross-examination with the court, the court authorized counsel to have a second attorney present at trial to insulate him from Dockins. After the government's third witness was sworn, Dockins addressed the jury, explaining that he did not want his attorneys representing him, and he was being forced to use them. Dockins continued to address the jury despite admonishment from the court and had to be removed.

The following morning Dockins returned to the courtroom to testify, outside the presence of the jury, regarding the admissibility of his statements to Agent Medley on July 23, 1987. Dockins insisted the interview occurred on July 20 and continued to do so when confronted with the fact that he was not arrested until July 22. He also testified that he had been in jail two or three days when the interview took place, but actually he had been confined less than 24 hours. Dockins also gave inconsistent answers about the substance of the interview. Dockins now claims that these inconsistencies were clear examples of confabulation. After this hearing, the jury returned and Dockins remained in the courtroom for the remainder of the trial without incident. Based

12

on these events, Dockins argues that the court erred in failing to grant a third competency hearing and a mistrial. We cannot agree.

A district court must hold a competency hearing following a showing of reasonable cause for believing the defendant may be incompetent. United States v. Williams, 819 F.2d 605, 608 (5th Cir. 1987); United States v. Morgan, 559 F.2d 397 (5th Cir. 1977). In this case, the district court was of the opinion that Dockins was deliberately attempting to cause a mistrial.[1] This assessment is entitled to considerable deference. See Maggio v. Fulford, 103 S. Ct. 2261, 2263-64 (1983) (reversing the Fifth Circuit and deferring to the district court's conclusion, based on observing the defendant, that defendant was intentionally trying to disrupt the trial); Williams, 819 F.2d at 608 (interpreting Fulford to allow a trial judge to base a finding of competence on personal observation in the face of a psychiatric report to the contrary).

Dockins' testimony during a hearing on a motion to suppress evidence seized from his car adds support to the court's decision not to conduct another competency hearing. On the first day of trial and before opening statements, Dockins testified in detail

---

[1]Outside the presence of the jury, Dockins told the court:

> I don't know how to represent myself. And the law - - the states if you don't want an attorney representing you, you can explain that to the jury, the defendant's conduct, or whatever, or however it states, that it's going to be a mistrial.

The court responded:

> Well, it's obvious to the Court what you're attempting to accomplish here.

13

about the events that occurred on the day of his arrest.  Included in this testimony was the fact that Dockins' uncle, James A. Shanks, accompanied him to Little Willie's on June 30, 1987.  Dockins also stated that Shanks was mayor of Jonestown, Mississippi in 1987, a fact later confirmed at trial.  Dockins also remembered that when he went to Little Willie's on the day of his arrest, Willie was not there because he had gone to a car sale in Memphis.  In addition to recounting these facts, Dockins explained why the highway patrolman could not have clocked him at 70 m.p.h. in a 55 m.p.h. zone.  He stated he was going no faster than 51 or 53 m.p.h., because he was caught in between two other cars and a trailer truck coming up behind him which prevented him from passing.  This testimony not only shows Dockins ability to recall what happened almost four years earlier but also his ability to formulate a defense.  The district court was not required to hold a third competency hearing or to grant a mistrial.[2]

### III.

Dockins argues that the evidence was insufficient to support his convictions for illegal possession of a firearm by a convicted

---

[2]Contrary to Dockins' urging, United States v. Hutson, 821 F.2d 1015, 1018 (5th Cir. 1987), does not argue for another hearing in this case.  Like this case, the defendant requested a competency hearing, was adjudicated incompetent, and was committed to an institution for evaluation and treatment.  However, unlike this case, when defendant's treating psychiatrist reported that she was competent to stand trial, the case proceeded to trial with no further competency hearings or findings.  We remanded for a hearing to determine whether the defendant was competent at the time of trial.  Here, the district court held a competency hearing after Springfield reported that Dockins was competent.

14

felon, 18 U.S.C. § 922(g)(1), and knowingly making false statements during the purchase of a firearm, 18 U.S.C. § 922(a)(6). Specifically, he argues the government failed to introduce any competent evidence of his status as a convicted felon, which was necessary to establish both offenses.

Without objection, the government introduced Exhibit 5, a judgment of conviction of Carl Tyron Smith on robbery charges in Colorado. The government attempted to link Dockins to this conviction through Exhibit 5a, a fingerprint card and police record sheet reflecting the arrest and conviction of Carl Smith. On its face, Exhibit 5a includes two official Denver Police Department documents. Agent Medley testified that he sent Exhibit 5a, along with handwriting exemplars, the original copy of the Form 4473, and a number of fingerprint cards, to the ATF Crime Laboratory. Medley said that Exhibit 5a included a fingerprint card from the Denver Police Department. Nancy Davis, a document examiner, testified that the signature of Carl Smith on the fingerprint card was written by Dockins. Next, the government called Rick Canty, a fingerprint expert, who testified that the fingerprints in Exhibit 5a matched the known fingerprints of Dockins. With Canty on the stand, the government offered Exhibit 5a into evidence. The court admitted the evidence over Dockins' objection on grounds of authentication.

After trial, Dockins moved for a Judgment of Acquittal Notwithstanding the Verdict or in the Alternative for a New Trial, claiming that Exhibits 5 and 5a had not been properly

15

authenticated.[3]  The court held a hearing on the authenticity of these two exhibits.  Laurence Jantz, an officer of the Denver Police Department, testified that the documents in Exhibit 5a were exact copies of the records in his file.  The court ruled that Exhibit 5 was properly admitted, because Dockins did not object.  As to Exhibit 5a, the court ruled that it was not a self-authenticating document under Rule 902.  Neither the fingerprint card nor the police record sheet is under seal and no public officer of the Denver Police Department certified under seal that the signature is genuine; the certification on the fingerprint card is only a rubber stamp.  See Fed. R. Evid. 902(2), (4); United States v. Beason, 690 F.2d 439 (5th Cir. 1982).  The court, without relying on the testimony of Jantz, nevertheless found this exhibit to be admissible under Rule 901.

The parties agree that the documents comprising Exhibit 5a are not self-authenticating.  Admissibility turns on Rule 901.[4]  We do not require conclusive proof of authenticity, and Rule 901's list

---

[3]Dockins also argued that these documents contained inadmissible hearsay; however, Dockins did not object on this ground at trial.  Authentication is the only question before us. See United States v. Wake, 948 F.2d 1422, 1434 (5th Cir. 1991).

[4]**Rule 901.  Requirement of Authentication or Identification**

**(a) General provision**

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
. . .

16

of illustrations is not exclusive.[5]  United States v. Jimenez Lopez, 873 F.2d 769, 772 (5th Cir. 1989); United States v. Lance, 853 F.2d 1177, 1181 (5th Cir. 1988).  The issue is whether the district court abused its discretion in finding that the government presented sufficient evidence at trial to support a finding that Exhibit 5a contained official Denver Police Department documents.  See First State Bank of Denton v. Maryland Cas. Co., 918 F.2d 38, 41 (5th Cir. 1990); Jimenez Lopez, 873 F.2d at 772.  We hold that it was an abuse of discretion to admit these documents.

Agent Medley testified that Exhibit 5a contained a fingerprint card from the Denver Police Department.  However, he was simply testifying as to what appears on the face of the document.  He had no knowledge, other than from reading the document, that the fingerprint card actually came from the Denver Police Department.[6] Furthermore, Davis and Canty simply compared the signature and fingerprints contained in Exhibit 5a with known samples from Dockins.  Their testimony had nothing to do with whether these documents came from the Denver Police Department.

Our decision in Jimenez Lopez is instructive.  That case also required proof of a prior conviction.  The government offered a copy of the Record of Proceedings and Judgment asserted to be from the office of a United States Magistrate for the Southern District of California.  Like this case, the document was not self-

---

[5]None of the illustrations in 901(b) apply to this case.

[6]901(b)(1) also does not apply for this reason.

17

authenticating.[7]  A border patrol agent, Johnston, testified that he personally requested the document and received it from a California border patrol agent who Johnston said procured it from the magistrate's court.  873 F.2d at 771.  In finding the document to have been properly admitted, we said,

> Without the testimony of Agent Johnston the admissibility of the document would have been doubtful.  But Johnston's testimony as to the chain of custody of the photostatic copy combined with the internal indicia of reliability within the document itself justified the conclusion of the court that the document was admissible to prove its contents.  Johnston was not testifying as custodian of the document.  Rather, his testimony provided circumstantial evidence to support the conclusion that the document was an official record.

Id. at 772.  Medley was certainly not the custodian.  Jantz was the custodian, but he did not testify at trial.[8]  The government offered no circumstantial evidence at trial to support a finding that Exhibit 5a came from the Denver Police Department.  Consequently, there was no basis for a reasonable jury to conclude that these documents were what they purported to be.  Cf.  United States v. Casto, 889 F.2d 562, 568-69 (5th Cir. 1989); United States v. Palella, 846 F.2d 977, 981 (5th Cir. 1988).

The admission of Exhibit 5a, however, does not warrant reversal.  See Fed. R. Evid. 103(a).  The error was harmless; put another way, there was sufficient evidence of Dockins' prior felony conviction without Exhibit 5a.  Cf. Sports Center, Inc. v. Riddell, Inc., 673 F.2d 786, 789 (5th Cir. 1982) (concluding under a

---

[7]A signature on the document was illegible.

[8]If Jantz had testified at trial, Exhibit 5a would have been admissible under 901(b)(7).

18

harmless error analysis that jury would have reached same result if improperly excluded evidence had been admitted); United States v. Turquitt, 557 F.2d 464, 471 (5th Cir. 1977) (concluding under harmless error analysis that jury may have acquitted without the improperly admitted evidence).  Dockins told Agent Medley he had a prior felony conviction in Colorado, that he used aliases, that he used the VISA card in the name of Carl Smith, and that he signed the name Carl Smith on the Form 4473.  Agent Medley testified to these admissions at trial.  While "'an accused may not be convicted on his own uncorroborated confession,'" United States v. Garth, 773 F.2d 1469, 1479 (5th Cir. 1985) (quoting Smith v. United States, 348 U.S. 147, 152 (1954)), Dockins' statements to Medley are sufficiently corroborated.  The judgment of conviction of Carl Smith was in evidence via Exhibit 5.  Additionally, Dockins identified himself at Little Willie's as Carl Smith.  His driver's license was suspended under the name of Carl Smith, and he told the trooper he was Carl Smith.  There was also a wealth of evidence linking Dockins to Colorado.  He gave a Colorado address on the Form 4473.  Moreover, his Colorado driver's license in the name of George J. Dockins displayed the same Colorado address that Dockins, using the name Carl Smith, listed on the Form 4473.  The license plates on his car were also from Colorado.  Without considering Exhibit 5a, the government proved beyond a reasonable doubt that Dockins had a prior felony conviction.

AFFIRMED.

19