**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 94-10833

(Summary Calendar)
_____


UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

versus

LONNIE D. CLARK,
a/k/a Chick Clark,

                              Defendant-Appellant.

_____

Appeal from the United States District Court
For the Northern District of Texas
(5:94-CR-18-C-01)
_____

(April 24, 1995)

Before SMITH, EMILIO M. GARZA, and PARKER, Circuit Judges.

PER CURIAM:[*]

     After the district court declared Lonnie D. Clark competent to stand trial, Clark pled guilty to mail fraud, *see* 18 U.S.C. § 1341 (Supp. V 1993) and 18 U.S.C. § 1342 (1988).  Clark appeals his conviction, asserting that the district court erred in determining that he was competent to stand trial.  We affirm.

_____

     [*]     Local Rule 47.5.1 provides:  "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession."  Pursuant to that Rule, the Court has determined that this opinion should not be published.

Over a fifteen month period, Clark obtained numerous disability insurance policies with an aggregate monthly benefit amount of more than $97,000. In the superseding information to which Clark pled guilty, the Government alleged that Clark had obtained these policies under false and fraudulent pretenses as part of an intentional scheme to defraud and obtain money from various insurance companies.

After all but one of the disability policies became effective, Clark was involved in an automobile accident. Hospital records indicate that he was unconscious and unresponsive to pain, but suffered from no obvious external trauma.[1] Doctors diagnosed Clark as having a closed-head injury and possible diffuse swelling of the brain.[2] One day later, Clark was transferred to another hospital, where doctors found only that small areas of Clark's brain might have suffered from a lack of oxygen.[3] Shortly thereafter, Clark was admitted to another hospital, where he incorrectly informed the staff that he had been unconscious for twenty-four hours after the accident.[4] During a psychological assessment, Clark complained of

---

[1]    According to the hospital records, Clark was unconscious for seven and one-half hours, after which he awoke, complaining of dizziness and a headache.

[2]    While the record reflects considerable disagreement over the severity of Clark's head injury, the occurrence of the accident and the existence of some head injury are not in dispute.

[3]    In the report she prepared for the competency hearing, Dr. Emily Follis, a forensic study specialist for the Bureau of Prisons, noted that a normal brain that had not suffered any trauma could also display signs of having suffered from a lack of oxygen.

[4]    Clark also told the staff that, before the accident, he had never experienced any of the problems of which he was complaining. Bureau of Prisons records indicated, however, that Clark had reported being involved in numerous

severe disorientation, cognitive confusion, blurred vision, and ringing in his ears, complaints not listed in records from the other two hospitals. Although an IQ test indicated that Clark possessed average or above-average abstract thinking capabilities, the psychologist diagnosed Clark as showing cognitive dysfunction due to organic brain damage.

After Clark was discharged, a neurosurgeon referred him to Dr. Randall Wolcott. Clark told Wolcott that he had been unconscious for nineteen hours after the accident. Based on the neurosurgeon's referral and information given by Clark, Wolcott diagnosed Clark as suffering from a significant post-concussion syndrome.[5] Clark then visited Dr. Bilde, Medical Director of the Comprehensive Medical Rehabilitation Center, to whom he provided similarly erroneous information concerning the length of his unconsciousness. Bilde stated that Clark manifested signs of "symptom magnification" and appeared mentally competent. Clark was later examined and tested by other health-care providers, who diagnosed Clark as suffering from varying degrees of cognitive impairment and memory loss.[6]

Throughout the period that he was being examined, tested, and

---

automobile and plane crashes, and had at various times complained of dizziness, seizures, fainting spells, breathing problems, muscle spasms, and knee, neck, and back problems.

[5] Among the symptoms Clark described to Wolcott were headaches, fainting spells, back pain, ringing in his ears, memory impairment, slowed thinking, irritable moods, and sleep disturbances. In making his diagnosis, Wolcott did not review Clark's past medical records.

[6] Dr. Follis identified several inconsistencies among the reports from persons evaluating Clark, including the independent neuropsychologists to whom the FCI sent Clark. She concluded that these inconsistencies were the result of both the false information supplied to the doctors by Clark and Clark's consistent exaggeration of his symptoms.

diagnosed by health-care providers, Clark also attended to his several business ventures. Within two months of the accident, Clark began collecting monthly payments under some of the disability insurance policies, which, by the date of his arrest and indictment in 1994, paid him over $ 917,000. Clark "rolled" the insurance proceeds by purchasing cashier's checks, holding the checks for a while, and then using them to buy new cashier's checks in a different payee's name. Clark also opened five new bank accounts, three of which were in Clark's name but under his son's social security number. The other two were corporate accounts for Nevada Gold & Silver, Inc., a corporation Clark had formed.[7] He transferred to Nevada Gold & Silver the titles to eleven vehicles registered in his name originally. After these transfers, Clark claimed an exemption from Texas' use tax law for the vehicles.[8]

Clark engaged in other post-accident business dealings. At an auction in Dallas, Texas, he purchased more than $20,000 in goods, designating them for resale to avoid paying Texas' sales tax. He also made a number of oil and gas investments with Michael Smith, the President and CEO of Skully and Smith Oil Corporation.

---

[7] Clark established Nevada Gold & Silver with the assistance of Derrick Rolley, Vice President of Corporate Service Center (CSC). CSC is a Nevada company that forms corporations, files corporate papers, acts as a resident agent, and provides other services to corporations. Rolley testified that, although he normally spent about an hour with a client who wanted to form a corporation, he spent only 15 to 20 minutes helping Clark set up Nevada Gold & Silver because Clark appeared to know exactly how he wanted the corporation structured.

[8] The last of the transfers occurred while Clark was on furlough from the Federal Correctional Institution (FCI), where the district court had sent him for his competency evaluation.

According to Smith's testimony, Clark was a reasonably sophisticated investor who was conversant in oil and gas industry jargon and with whom Smith had no trouble communicating.[9] Two months before his arrest and indictment, Clark, as a co-applicant with Nevada Gold & Silver, opened an account with Kennedy & Cabot, a discount brokerage firm.[10] Kennedy & Cabot places stock orders exclusively for sophisticated investors who do not require advice concerning how or with whom to invest. Some of the stock orders placed through Kennedy & Cabot were for stocks sold on Canadian exchanges. Many of the orders were limited, that is, Clark or Jose Fernandez, his associate, directed the transactions by specifying prices at which to buy or sell shares.[11]

Based on his allegedly illegal transactions, Clark was indicted on charges of mail fraud, money laundering, and criminal forfeiture. On the Government's motion, the district court ordered that Clark be committed to the FCI for a thirty-day evaluation of his mental competency to stand trial. While Clark was at the FCI, Dr. Emily Follis evaluated and observed Clark. After reviewing his available medical history and conducting interviews with Clark and

---

[9] Smith testified that Clark understood industry terms such as royalty interest, working interest, current, and turnkey, and that Clark was aware that the meanings of these terms might vary from one operator to the next. Smith also testified that Clark discussed his past and current legal problems during the course of their business conversations.

[10] The account was opened with a $ 100,000 cashier's check purchased by Clark, and the account records listed Clark's name and Brownfield, Texas, address and telephone number, although another person, Jose Fernandez, was also listed as a co-applicant.

[11] It is unclear from the record how many, if any, of the stock transactions were conducted by Fernandez and how many by Clark.

FCI staff members who interacted with Clark,[12] Follis prepared a comprehensive report concluding that Clark was mentally competent. After a competency hearing at which the trial court found Clark competent to stand trial, Clark pled guilty to mail fraud. He was sentenced to thirty-three months in custody and two years of supervised release, and ordered to pay $ 917,470.69 restitution and a $ 50 special assessment.[13] Clark appeals his conviction, claiming that the district court erred in declaring him competent to stand trial.

II

"The question of competency . . . is a mixed question of law and fact which has direct constitutional repercussions." *United States v. Makris*, 535 F.2d 899, 907 (5th Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S. Ct. 1598, 51 L. Ed. 2d 803 (1977). We will overturn a district court's determination of a defendant's competency to stand trial or to plead guilty only if it is "clearly arbitrary or unwarranted." *United States v. Dockins*, 986 F.2d 888, 890 (5th Cir.) (quoting *United States v. Birdsell*, 775 F.2d 645, 648 (5th Cir. 1985), *cert. denied*, 476 U.S. 1119, 106 S. Ct. 1979,

---

[12] With the exception of their last meeting at the FCI, all of Follis' attempts to interview Clark were, for the most part, unsuccessful. Clark typically responded to Follis' questions with silence or "I don't know." According to Follis, her discussions with other FCI staff who had dealt with Clark revealed that Clark had no problems communicating with other inmates or with the FCI staff. Further, a neurologist and a neuropsychologist outside FCI who tested Clark during his stay at FCI reported no difficulty conversing with him, eliciting his medical history, or asking him questions.

[13] In accordance with a plea agreement, the Government then moved to dismiss two prior indictments. Clark and his son had been indicted previously on charges of mail fraud, and the competency matters in both indictments were consolidated on the Government's unopposed motion.

90 L. Ed. 2d 662 (1986)), *cert. denied*, ___ U.S. ___, 114 S. Ct. 149, 126 L. Ed. 2d 111 (1993).[14]

"The conviction of a mentally incompetent defendant violates the Due Process Clause." *DeVille v. Whitley*, 21 F.3d 654, 656 (5th Cir.), *cert. denied*, ___ U.S. ___, 115 S. Ct. 436, 130 L. Ed. 2d 348 (1994). In order to declare a defendant incompetent to stand trial, a district court must find "by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his own defense." 18 U.S.C. § 4241(d) (1988); *Dockins*, 986 F.2d at 890.[15] The standard for determining a defendant's competency to plead guilty is identical to that for assessing a defendant's competency to stand trial. *DeVille*, 21 F.3d at 656.

Six witnesses testified at the competency hearing: four lay witnesses and one expert witness for the government, and one expert witness for Clark. Follis based her testimony on several interviews with Clark while he was confined at the FCI, as well as

---

[14] We will, however, "take a hard look at the trial judge's ultimate conclusion and not allow the talisman of clearly erroneous to substitute for thoroughgoing appellate review of quasi-legal issues." *Id.* (quoting *Makris*, 535 F.2d at 907; *Birdsell*, 775 F.2d at 648.

[15] The court's determination is often phrased in substantively similar language derived from *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960), which applied an earlier version of the statute: "[W]hether the defendant has `sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has `a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran*, ___ U.S. ___, ___, 113 S. Ct. 2680, 2685, 125 L. Ed. 2d 321 (1993) (quoting *Dusky*, 362 U.S. at 402, 80 S. Ct. at 789); *see also DeVille*, 21 F.3d at 656 (applying *Dusky*).

interviews with others who dealt with Clark during his stay at the FCI. Follis also reviewed all of Clark's available medical records; his prior criminal history, including previous incarcerations; transcripts from earlier cases in which Clark was involved; and transcripts of Clark's telephone conversations during calls placed from the FCI. Follis testified that in his phone conversations, Clark seemed to have no problem communicating about and even giving directions for the resolution of his legal problems.[16] Follis also secretly observed Clark, during which time he was visibly free of the head twitches that he ordinarily displayed in her presence. In Follis's opinion, although Clark did suffer a head injury in the 1991 automobile accident, he was apt to exaggerate his symptoms whenever he could gain from doing so.[17] Follis attempted to administer a psychological test, but Clark marked every answer false.[18] Follis testified that, in her opinion, Clark understood the nature of the proceedings against him and was able to assist his attorney in his own defense.

---

[16] During the two phone calls transcribed in Follis's report, Clark discussed his legal problems with both his common-law wife and a friend. Clark directed his friend to prepare a writ of habeas corpus for him because Clark had been researching habeas corpus cases and considered this court reluctant to grant a writ of mandamus.

[17] Upon reviewing Clark's previous criminal and medical history, Follis indicated that Clark typically exaggerated his mental or physical disabilities when he stood to gain from appearing feeble, but minimized those traits when he needed to appear fit. According to Follis, Clark's malingering was apparent in his attempts to use medical complaints to influence sentencing decisions in previous criminal cases, and in the conspicuous cessation of Clark's complaints of chronic pain and seizures when he had a chance to receive furloughs or work as a town driver.

[18] Because Clark provided inconsistent information to many of the persons who evaluated him, including those who administered objective tests, Follis discounted their conclusions to the extent that they were partially based upon the erroneous information given by Clark.

In addition to Follis's expert testimony, the Government called four lay witnesses at the competency hearing. Jesse Horton, a postal inspector, testified about Clark's activities in procuring the disability insurance policies, collecting on the policies, converting the insurance proceeds to cashier's checks, and transferring personal assets to Nevada Gold & Silver for tax purposes. Consistent with Follis's testimony regarding Clark's controlled manifestation of his symptoms, Horton testified that he had secretly observed Clark walking briskly around Clark's home without a trace of the limping or shaking that Clark normally displayed when he knew he was being watched. Of the other lay witnesses, Clark's business associates each testified about their business dealings with Clark. Not only did Smith and Rolley not have difficulty communicating with Clark, each considered Clark at least as sophisticated or knowledgeable as an average client. Also, Michael Smith, one of the business associates, testified that during business calls after Clark had been released from the FCI, Clark had discussed his legal problems with Smith and had expressed a desire to continue his investments after resolution of his legal problems. Finally, although the record does not clearly establish whether Clark or Fernandez directed the stock dealings with Kennedy & Cabot, the evidence suggests that Clark placed some of the orders.

Clark called as an expert witness Dr. Randall Wolcott, who had treated Clark periodically from a few months after the automobile accident until Clark's arrest two years later. Wolcott diagnosed

Clark as having suffered a severe coma as a result of the accident. Wolcott testified that Clark suffered from cognitive deficits--such as memory deficits, decreased abstraction, decreased learning abilities, illogical thoughts, difficulty with generalization, distractibility, and fatigue--that commonly manifest in persons who have suffered closed-head injuries. According to Wolcott, Clark had difficulty remembering important facts and events, placing events in a proper temporal sequence, and focusing on more than one problem at a time. In Wolcott's view, the consequence of these cognitive deficiencies was that Clark was unable properly to assist in his own defense.[19]

Clark argues that the district court should have followed Dr. Wolcott's diagnosis and conclusions.

> In the final analysis, [however,] the determination of competency is a legal conclusion; even if the experts' medical conclusions of impaired ability are credited, the judge must still independently decide if the particular defendant was legally capable of reasonable consultation with his attorney and able to rationally and factually comprehend the proceedings against him.

*Makris*, 535 F.2d at 908. Although objective tests administered by different health care providers indicated that Clark suffered from some cognitive impairment, there was ample evidence to support a conclusion that Clark exaggerated his mental disabilities and was competent to stand trial. *See Dockins*, 986 F.2d at 892 (holding that trial court properly concluded defendant "was simply attempting to manipulate the court" based on expert opinion that

---

[19] Wolcott's diagnosis was based on information given to him by Clark, his ongoing observations of Clark, and results of tests conducted by other health care providers.

defendant "was in control of his memory loss").  In finding that Clark did not suffer from a mental disease or defect that would render him unable to understand the nature of the proceedings against him or properly assist in his own defense, the district court credited the testimony of the Government witnesses over that of Wolcott.  We cannot say that the district court was clearly arbitrary or unwarranted in so doing.  *See id.* at 893 (upholding competency determination as not arbitrary or unwarranted where trial judge credited subjective evaluations and testimony over testimony by doctor who performed objective tests); *see also Birdsell*, 775 F.2d at 651 (upholding competency determination where district court reasonably credited government witnesses' testimony over defendant's expert's testimony); *United States v. Fratus*, 530 F.2d 644, 647 (5th Cir.) (affirming trial court's competency determination where experts for government and defendant each gave strong but conflicting testimony), *cert. denied*, 429 U.S. 846, 97 S. Ct. 130, 50 L. Ed. 2d 118 (1976).

Moreover, the lay testimony supported Follis's conclusion that Clark was able to understand the nature and consequences of the proceedings against him and assist properly in his own defense. *See Makris*, 535 F.2d at 908-09 (upholding competency determination where "overwhelming" lay testimony regarding defendant's business acuity and ability to conduct complicated transactions led to conclusion that defendant, though somewhat impaired, was highly competent); *cf. United States v. Gray*, 421 F.2d 316, 318 (5th Cir. 1970) (recognizing potential importance of lay testimony in

competency hearing).  Having considered all of the evidence presented at the competency hearing, we conclude that the district court's finding that Clark was competent to stand trial was not clearly arbitrary or unwarranted.  Accordingly, Clark's guilty plea and conviction were proper.

III

For the foregoing reasons, WE AFFIRM Clark's conviction.