# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 3, 2020

Lyle W. Cayce
Clerk

No. 19-60370

United States of America,

*Plaintiff—Appellee*,

*versus*

Jerry Lee Quinn,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:18-CR-49-1

Before Stewart, Clement, and Costa, *Circuit Judges*.
Gregg Costa, *Circuit Judge*:*

A jury convicted Jerry Lee Quinn of gun and drug crimes. Quinn argues that the district court should not have admitted a prior statement of a key witness, did not adequately inquire into his request to substitute court-appointed counsel, and erred in finding him competent to stand trial. Finding no reversible error, we AFFIRM.

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 19-60370

## I.

Quinn and Randy Buckingham were outside Buckingham's house when law enforcement arrived to arrest Quinn on a state warrant. The pair fled. Buckingham ran through the house before a K-9 unit captured him at the back of the house roughly fifteen seconds later. Another K-9 unit caught Quinn in nearby woods.

Buckingham was carrying two backpacks when he was arrested. The blue backpack contained: (1) a Crown Royal bag with 24.3 grams of marijuana inside; (2) a loaded 9-millimeter pistol wrapped in a manila envelope; (3) a loaded revolver wrapped inside of a white envelope; (4) a toothbrush that, based on later testing, has Quinn's DNA; (5) three rewards cards linked to Quinn's name; and (6) a graduation party invitation from Quinn. The black backpack contained: (1) one round of 9-millimeter ammunition; (2) a hairbrush that, based on later testing, has Quinn's DNA; (3) Quinn's birth certificate; (4) some legal paperwork with Quinn's name; and (5) an airplane ticket in Quinn's name. In a written statement, Buckingham said the bags, guns, and drugs were Quinn's.

A search of the house revealed two containers of marijuana: one on a stereo and one in a bedroom near a duffel bag. The bag contained miscellaneous clothing and religious material, with a postcard addressed to Quinn inside a book.

A grand jury charged Quinn with being a felon in possession of a firearm, possession with intent to distribute marijuana, marijuana distribution, and using a firearm in furtherance of a drug trafficking crime. Quinn claimed he was incompetent to stand trial on account of memory loss. Finding credible the testimony of a psychologist who evaluated Quinn and concluded he was malingering, the district court found him competent.

No. 19-60370

Quinn, who was represented by the Public Defender's Office, also twice asked for a new lawyer, but the court denied his requests.

Buckingham testified at trial, telling the jury that the drugs and guns found in the backpacks and his home belonged to Quinn. The jury convicted Quinn on all charges except using a firearm in furtherance of a drug trafficking crime. The court sentenced him to 65 months in prison.

II.

Quinn first argues that the district court erred in admitting a prior statement of Buckingham's—the one he made the night he and Quinn were arrested—that corroborated his testimony that the guns and drugs belonged to Quinn.[1] A prior statement is not hearsay, and can be used not just for impeachment but also as substantive evidence, if: (1) the declarant testifies and is subject to cross-examination about the statement; (2) there was an express or implied charge that the declarant recently fabricated his testimony or testified with a recent improper influence or motive; (3) the proponent offers a prior statement from the declarant that is consistent with his in-court testimony to rebut the charge of improper motive; and (4) the declarant made the prior statement before the time his alleged improper motive arose. *Tome v. United States*, 513 U.S. 150, 156–57 (1995) (citing FED. R. EVID. 801(d)(1)(B)). Quinn challenges the final "premotive" requirement. This temporal limitation does not appear in the text of Rule 801 but is a common-law principle that the Supreme Court read into the rule. *Id.* at 156. The rationale is that only statements made before an alleged improper motive took root are "direct and forceful" enough to "square[ly] rebut[]" such a charge. *Id.* at 158. In *Tome*, that meant prosecutors could not introduce prior

---

[1] The court did not actually admit Buckingham's written statement but allowed him to testify about it during the government's redirect.

statements that a child had accused her father of sexual abuse in response to an argument that the child's allegations were motivated by a desire to live with her mother as that motive also existed when she made the out-of-court statements. *Id.* at 165–67.

Although he objected to the prior statement, Quinn did not invoke the premotive requirement, or anything about hearsay, as a reason for excluding it. That impacts the standard of review. The government does not argue that Quinn failed to preserve this issue, but we are not bound by the standard of review the parties urge.[2] *See, e.g.*, *United States v. Davis*, 380 F.3d 821, 827 (5th Cir. 2004). A "generic[] assert[ion] that 'Rule 801(d)(1)(B) does not apply'"—and not even that objection was made here as defense counsel just argued that asking about the prior statement on redirect was beyond the scope of cross-examination—is too general to preserve a premotive challenge. *United States v. Williams*, 264 F.3d 561, 575 (5th Cir. 2001) That is because the premotive requirement is not obvious from Rule 801's text, so a broad objection is not "specific enough to allow the trial court to take testimony, receive argument, or otherwise explore the issue." *Id.* (citation omitted). Plain-error review is thus appropriate. *Id.* at 576.

The second requirement of plain-error review—the need for the error to be plain or obvious for us to correct it when the district court was not given the chance to do so—dooms Quinn's challenge to the prior statement. *United States v. Maturin*, 488 F.3d 657, 663 (5th Cir. 2007) ("An error is considered plain, or obvious, for purposes of this court's plain error inquiry

---

[2] In supplemental briefing, Quinn argues that the government can waive the standard of review. In doing so, however, he cites cases involving the procedural default rule of federal habeas law. *See, e.g., Trest v. Cain*, 522 U.S. 87, 89 (1997); *Atkins v Hooper*, -- F.3d --, 2020 WL 4557116, at *2 (5th Cir. Aug. 7, 2020). Unlike the standard of review, procedural default is an affirmative defense to a petition seeking postconviction relief and is thus waivable. *See Magouirk v. Phillips*, 144 F.3d 348, 357 (5th Cir. 1998).

only if the error is clear under existing law."); *accord United States v. Olano*, 507 U.S. 725, 734 (1993). That is because Quinn's lawyer crossed Buckingham about two motives he had to falsely accuse Quinn. First, he insinuated that Buckingham would have wanted to shift blame as soon as he was caught to avoid criminal liability. If the guns and drugs were his, he would have been guilty of not only the drug crimes but also of possessing a firearm as a felon. Second, and more prominently, he highlighted how Buckingham faced state marijuana charges (some from his night with Quinn and some from an earlier incident) that prosecutors promised to drop if he testified against Quinn.

Quinn now argues the statement was inadmissible because Buckingham had a motive to lie when he made the written statement— namely, his desire to avoid criminal liability. But the second motive to lie, relating to the deal Buckingham obtained from prosecutors, did not exist when he made the out-of-court statement implicating Quinn.

Quinn's appeal thus raises the question whether, to be admissible, Buckingham's prior statement had to rebut one or both of the improper motives Quinn alleged at trial. If the statement had to rebut only one motive, then it was admissible because it predated the plea deal.

Neither *Tome* nor our court has addressed this "two motives" question.[3] The federal appellate courts that have confronted the issue

---

[3] We have held that "[a] prior consistent statement need not rebut all motives to fabricate, but only the specific motive alleged at trial." *United States v. Wilson*, 355 F.3d 358, 361 (5th Cir. 2003). That statement does not directly address a situation like this one when a party alleged multiple improper motives *at trial*. *Wilson*'s reasoning, however, supports the majority view that the prior statement is admissible so long as it was made before at least one motive to lie that was presented to the jury. Like Buckingham, the *Wilson* witness made the prior statement before the opportunity for a plea deal arose. *Id*. The premotive requirement was thus satisfied, and the prior statement could be used to rebut the charge that he was testifying against the defendant because of the plea deal. *Id*. It did

unanimously hold that the prior statement may come in so long as it predated one of the alleged motives to lie. *See United States v. Kootswatewa*, 893 F.3d 1127, 1135 (9th Cir. 2018); *United States v. Londondio*, 420 F.3d 777, 784–85 (8th Cir. 2005); *see also United States v. Allison*, 49 M.J. 54, 57 (C.A.A.F. 1998). State and District of Columbia courts applying rules of evidence that contain a premotive requirement are split, but a slight majority take the view federal courts have. *Compare Mason v. United States*, 53 A.3d 1084, 1092 (D.C. 2012), *People v. Hillhouse*, 40 P.3d 754, 769 (Cal. 2002), and *Dowthitt v. State*, 931 S.W.2d 244, 264 (Tex. Crim. App. 1996) (all admitting the statements if they predate one alleged motive), *with Thomas v. State*, 55 A.3d 10, 22 (Md. 2012), and *People v. Lewis*, 408 N.W.2d 94, 99 (Mich. Ct. App. 1987) (both admitting a statement only if it predates all possible motives to fabricate). The majority position reasons that "[a] prior consistent statement logically bolsters a witness's credibility whenever it predates *any* motive to lie, not just when it predates all possible motives." *Hillhouse*, 40 P.3d at 769. And one court has explained that a jury told about alleged improper motives that arose before and after a prior consistent statement is capable of weighing the competing inferences. *Mason*, 53 A.3d at 1092-93. The minority view reasons that any improper motive arising before a prior statement casts doubt on its veracity, thus depriving the statement of the credibility needed for its use as substantive evidence of guilt. *See Thomas*, 55 A.3d at 20–22 (citing *Tome*, 513 U.S. at 158).

---

not matter that the witness had another motive to lie when he made the statement—he was trying to extort someone into paying for his attorney. *Id.* If Quinn is correct that any motive to lie deprives the statement of the reliability Rule 801(d)(1)(B) requires, then it should not matter whether that motive was presented to the jury. But *Wilson* does not take that view and allows the statement. In doing so, it relies on two of the cases that considered our situation involving two motives presented at trial and allowed the prior statement because it predated at least one of the motives. *Id.* at 361–62 (citing *United States v. Allison*, 49 M.J. 54, 57 (C.A.A.F. 1998); *Dowthitt v. State*, 931 S.W.2d 244, 264 (Tex. Crim. App. 1996)).

No. 19-60370

We need not take a position on this issue because of the plain-error posture. An error cannot be obvious when there is a split in persuasive authority, especially when every court applying the federal rules of evidence has allowed the statement in this double-motive scenario. The premotive requirement thus cannot be a basis for vacating Quinn's conviction when the trial court was not apprised of the issue.

### III.

Quinn also contends that the district court failed to inquire into complaints he made about his trial lawyer in violation of the Sixth Amendment.[4] He made two requests for a new lawyer: one during trial and another before sentencing.

The Sixth Amendment guarantees indigent defendants the right to appointed counsel, but it does not promise them the counsel of their choice. *United States v. Mitchell*, 709 F.3d 436, 441 (5th Cir. 2013). Nevertheless, when a defendant makes a good-faith request for new counsel, the district court typically must inquire about why he is dissatisfied. 3 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 11.4(b) (4th ed. 2019); *see also United States v. Woods*, 487 F.2d 1218, 1219–20 (5th Cir. 1973); *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973). The inquiry allows the court to assess if there is a problem that could affect the lawyer's ability to represent the defendant. *See United States v. Fields*, 483 F.3d 313, 352 (5th Cir. 2007). A defendant is entitled to substitute appointed counsel only if he shows "good cause, such as a conflict of interest, a complete breakdown in

---

[4] Quinn does not argue the court abused its discretion in denying him substitute counsel absent a Sixth Amendment violation. That would pose a much higher bar for him. A district court's discretion is "broad" when handling last-minute requests like Quinn's. *United States v. Norris*, 780 F.2d 1207, 1211 (5th Cir. 1986).

communication[,] or an irreconcilable conflict which leads to an apparently unjust verdict." *Young*, 482 F.2d at 995 (citation omitted).

On the first day of trial, the court memorialized an in-chambers meeting during which Quinn requested a different attorney. It summarized Quinn's concerns as (1) not feeling comfortable with his public defender, and (2) discontent that the public defender had not represented him aggressively. The court noted that it had held hearings and granted several of the public defender's motions without hearing any complaints from Quinn. It then stated that Quinn's complaints were untimely. When the court asked Quinn if he had anything to add, Quinn responded that he was hoping for a hearing and ruling on his *pro se* motion to dismiss for a Speedy Trial Act violation. The court later clarified that it had already denied the motion.

The district court satisfied its duty to inquire about this last-minute request for new trial counsel. "The duty to inquire is not so formalistic as to require affirmative questioning when such is rendered unnecessary because the parties have volunteered all the relevant information for a court to determine that no substantial conflict exists." *Fields*, 483 F.3d at 352. And contrary to Quinn's assertions, there are no other instances when he complained about counsel before or during trial.

The concerns Quinn did raise were not good cause for new appointed counsel. Mere discomfort with one's lawyer falls far short of the usual justifications that warrant a new one. *See United States v. Romans*, 823 F.3d 299, 312–13 (5th Cir. 2016) ("Although it is evident that [the defendant] mistrusted and disliked [his appointed counsel], there is no indication that there was a 'complete breakdown in communication' or an 'irreconcilable conflict' between the two, nor is there any evidence of a conflict of interest."). So do qualms with a lawyer's aggressiveness, which reflect strategic differences rather than constitutionally inadequate representation.

*See* 3 LAFAVE ET AL., *supra*, § 11.4(b) ("[T]he defendant cannot insist upon new counsel because he doesn't like the appointed counsel's 'attitude[]' . . . or approach on matters of strategy."); *see also United States v. Moore*, 706 F.2d 538, 540 (5th Cir. 1983) (a defendant is not entitled to "an attorney who agrees with [his] personal view of the prevailing law" nor "an attorney who will docilely do as he is told"). Accordingly, the district court did not violate Quinn's Sixth Amendment right in responding to the concerns he raised about his lawyer at trial.

Nor did the court err when Quinn reurged the request for new counsel before sentencing. In a letter to the court, he stated there was "a conflict of interest" and "assert[ed] ineffective assistance of trial counsel for working with the government to tear down [his] defenses." Quinn said that the public defender: (1) "fail[ed] to defend [his] right to speedy trial"; (2) failed to subpoena a defense witness and "failed to keep prosecution witness under subpoena as a defense witness"; and (3) "came to the jail days prior to trial and attacked and assaulted [him] verbally." The district court rejected Quinn's request as "inappropriate" because sentencing would "be conducted shortly."

Assuming the district court should have interpreted Quinn's letter as a motion to substitute counsel, Quinn's post-trial complaint presents a closer issue than his earlier one. The district court held no hearing to discuss his post-trial complaints. Again, however, the key is whether the court had enough information to "adequately appraise" Quinn's concerns without further inquiry. *United States v. Stewart*, 671 F. App'x 325, 326 (5th Cir. 2016) (per curiam).

It did. To begin, the court had already denied Quinn's *pro se* motion to dismiss the indictment for Speedy Trial Act violations (it was frivolous). The public defender's refusal to file that frivolous motion—Quinn was

counting time he was in state custody before appearing on the federal charge, *see* 18 U.S.C. § 3161(c)(1) (starting the speedy trial clock from the later of the return of the indictment or the appearance of the defendant)—did not make him constitutionally ineffective. *See Romans*, 823 F.3d at 312 (holding there was not good cause for new counsel when defendant had complained that his lawyer "was not filing the motions that he wanted him to file").

The same goes for the public defender's strategic decisions about witnesses. *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) ("[C]omplaints based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain."). The public defender explained that Quinn had initially not helped him find any witnesses. *See also Fields*, 483 F.3d at 352 (citing cases for the proposition that, when faced with a defendant's complaints about his counsel, a court can credit the defense attorney's representations). Quinn eventually decided he wanted to call witnesses, but only after opening statements. The next day, the public defender was still prepared to examine two witnesses (and called one), notwithstanding Quinn's about-face. Accordingly, what "the court heard on the record apprised it sufficiently of the relevant facts" to determine that Quinn's lawyer had not been constitutionally derelict in failing to subpoena witnesses. *Id.*

The record reveals little about the third allegation in Quinn's letter—that his lawyer verbally assaulted him in jail before trial. Rectifying that dearth of information is the purpose of the duty to inquire. *See id.* But two points suggest that affirmative questioning on this concern was also unnecessary. First, Quinn said the jailhouse altercation took place before trial and thus before he raised his initial concerns about his lawyer. That means either the district court already considered the allegation before receiving Quinn's letter or Quinn did not mention it among his first round of

concerns.  Either situation casts doubt on the seriousness of the allegation. Second, what the district court observed at trial suggested that any strife between Quinn and his lawyer was not enough of an impediment to constitute good cause for substitute counsel.  The trial record reveals numerous instances of Quinn and his lawyer working together.  One example occurred during a recess, when Quinn described how he and his lawyer were "talking about the witnesses we should call."  Later there was an "[o]ff-the-record discussion" between Quinn and his lawyer during direct examination of the defense's sole witness.  As these and other examples show, whatever happened in the jailhouse did not result in "a complete breakdown in communication or an irreconcilable conflict."  *See Young*, 482 F.2d at 995 (citation omitted).

The district court did not err in denying Quinn new counsel for sentencing without holding a hearing on the request.[5]

---

[5] Because we find no error, we need not decide what the remedy would be.  Many older cases treated duty-to-inquire error as warranting automatic reversal.  *See, e.g.*, *Woods*, 487 F.2d at 1220; *see also* 3 LAFAVE ET AL., *supra*, § 11.4(b) n.40 (collecting cases).  But the recent trend has been to assess the error's impact, either for harmlessness (in which case the government bears the burden) or prejudice (the *Strickland* inquiry, which, among other things, puts the burden on the defendant).  *See United States v. Lott*, 310 F.3d 1231, 1250 (10th Cir. 2002); *United States v. Calderon*, 127 F.3d 1314, 1343 (11th Cir. 1997); *United States v. Graham*, 91 F.3d 213, 221–22 (D.C. Cir. 1996); *United States v. Zillges*, 978 F.2d 369, 372–73 (7th Cir. 1992).  A leading treatise reads Supreme Court dicta as indicating that *Strickland* applies.  3 LAFAVE ET AL., *supra*, § 11.4(b) (explaining that *Mickens v. Taylor*, 535 U.S. 162 (2002), "characterized the *Strickland* prejudice standard as ordinarily governing any claim that ultimately rests on the ineffective assistance of counsel").

Some Fifth Circuit cases follow this modern trend requiring some impact on the representation from a failure to inquire, though they do not articulate a standard or specify which party bears the burden of meeting it.  *See, e.g.*, *Young*, 482 F.2d at 995–96; *Stewart*, 671 F. App'x at 326.  To the extent that is the governing standard, it is notable that Quinn's counsel obtained an acquittal on the firearm charge that would have required a sentence of

No. 19-60370

IV.

Quinn's final argument is that there should not have even been a trial because he was not competent. After Quinn's counsel raised a concern about competency, the district court ordered an evaluation. Once the examination was complete, the court held a competency hearing. Quinn testified that he did not remember the events leading to his arrest. Bureau of Prisons psychologist Leticia Armstrong, who had observed Quinn for about a month and interviewed him ten times, opined that Quinn was malingering. The district court credited Dr. Armstrong's testimony, finding that Quinn was competent and feigning memory loss.

Quinn asserts that Armstrong's evaluation was flawed. He says that she focused too much on whether he could follow the legal proceedings against him and not enough on his memory loss. He also challenges Armstrong's methodology, claiming that, for various reasons, the tests she used to rule out amnesia missed genuine memory problems.

Quinn's arguments face an uphill climb as we will overturn a district court's competency finding only if it was "clearly arbitrary or unwarranted." *United States v. Stanford*, 805 F.3d 557, 571 (5th Cir. 2015) (citation omitted). We have recognized that such deference is especially appropriate when the defendant claims amnesia. *United States v. Swanson*, 572 F.2d 523, 526–27 (5th Cir. 1978). For that difficult-to-assess condition, the district court hearing the medical testimony and other evidence is in the "best position" to decide whether the amnesia claim is being used as an "unjustified haven for a defendant" or describes an actual defect rendering the defendant incompetent. *Id*. at 526.

---

five years consecutive to the sentence for his other offenses. *See* 18 U.S.C. § 924(c)(1)(A)(i).

Quinn cannot demonstrate that the district court's competency finding was clearly arbitrary or unwarranted. On the contrary, the court's finding had a strong basis in the record. Most significantly, the only psychological expert that testified opined—based on a month-long evaluation—that he was competent. *See United States v. Birdsell*, 775 F.2d 645, 649–51 (5th Cir. 1985) (upholding competency finding based on opinion of government experts who observed defendant while he was incarcerated over 90-day period). Even when experts disagree on competency, crediting one of those experts will usually sustain a competency finding. *See, e.g.*, *Stanford*, 805 F.3d at 571–72; *United States v. Dockins*, 986 F.2d 888, 892–93 (5th Cir. 1993).

Although Armstrong's report might not have spilled as much ink on Quinn's claims of memory loss as he would have liked, she did address them. Armstrong considered whether Quinn's reported memory problems could have been caused by a neurocognitive disorder due to traumatic brain injury suffered during his arrest. But she rejected that notion because Quinn's medical records did not show that he suffered any traumatic brain injury, Quinn's own reporting was inconsistent, and staff observations of Quinn were inconsistent with a cognitive deficit.

Those observations of Quinn's everyday interactions, along with test results showing a lack of effort, led Armstrong to conclude Quinn was feigning his amnesia. That evidence supports a malingering determination. *See Dockins*, 986 F.2d at 891. The district court was not off-base in concluding that Quinn was competent; plenty of evidence supported its conclusion.

\* \* \*

The judgment is AFFIRMED.